UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:15-cr-24-WTL-DKL-1 |
| ) | |
| DANIEL STEWART, ) | |
| ) | |
| Defendant. ) | |
| ) | |

### ENTRY ON MOTION TO SUPPRESS EVIDENCE

This cause is before the Court on Defendant Daniel Stewart's Motion to Suppress Evidence (Dkt. No. 33). Specifically, Stewart seeks to suppress the following: 1) evidence obtained from the January 20, 2015, warrantless search of the vehicle Stewart was driving; 2) the statements Stewart made subsequent to his arrest on January 20, 2015; and 3) evidence obtained from the search of Stewart's residence that was performed pursuant to a warrant. The Court held an evidentiary hearing on Stewart's motion on October 7, 2015.  Pursuant to Federal Rule of Criminal Procedure 12(d), the Court now states its findings and conclusions.  For the reasons explained herein, Stewart's Motion to Suppress Evidence is **DENIED**.

### I. BACKGROUND

On January 20, 2015, at approximately 6:30 p.m., Indianapolis Metropolitan Police Department Detectives Jeff Sequin and Ryan VanOeveren were conducting surveillance at Stewart's residence, 4523 Eagle Creek Parkway, Apartment 101, Indianapolis, Indiana. The detectives believed that Stewart was a large-scale drug customer of Geraldo Colon, who was later indicted in a drug-conspiracy case. The detectives followed Stewart as he left his home as

the driver and sole occupant of a white Volkswagen.

Stewart pulled into a gas station and parked his car at a gas pump. A man got out of another car and walked to Stewart's Volkswagen. He entered Stewart's Volkswagen through the front passenger door. After about three minutes, the man got out of Stewart's Volkswagen, walked back to his car, and left the gas station. Stewart then got out of the Volkswagen, pumped gas, and left the gas station.

VanOeveren believed that he had just witnessed a hand-to-hand drug transaction. He and Sequin continued to follow Stewart as he drove his Volkswagen northbound on Interstate 65 to northbound Interstate 465 and exited at the 86th Street exit. VanOeveren saw Stewart fail to come to a complete stop at the red light at the bottom of the exit ramp.

VanOeveren already had contacted Brady Ball, a detective with the Indianapolis Metropolitan Police Department, for assistance that evening. Ball and his K9 partner, Josie, had been working since about 6 p.m. that day. After Stewart failed to come to a complete stop at the red light, Ball, who was uniformed and in a marked police car, activated his emergency lights and pulled Stewart over. Ball noticed that Stewart seemed extremely nervous, as he fidgeted with his wallet and took several deep breaths.

Ball had Stewart step out of the vehicle. Ball asked him questions for a few minutes and then called for an additional car so that he could have Josie perform a canine sniff. During that time, Ball obtained Stewart's information, ran Stewart's license plate, and began the process of writing a ticket. Additional officers arrived approximately eight minutes after Ball first called for them and as Ball was writing the ticket. Ball directed one officer to continue to type the ticket and the other to watch Stewart. About ninety seconds after additional officers arrived (and

2

approximately fifteen minutes after Ball first pulled Stewart over), Ball had Josie perform an open air sniff around the car. In accordance with her training, Josie made one full circle around the car. She then continued around the car and alerted on the front driver's side door. The sniff took approximately one minute.

      Ball then searched Stewart's car, beginning with the passenger compartment. Ball found a firearm that was loaded with an extended magazine between the driver's seat and the middle console. Ball knew from a records check that Stewart had prior felony convictions, so Ball placed Stewart under arrest and informed him of his *Miranda* rights. Stewart indicated that he understood his rights. Ball asked Stewart why he had a gun, and Stewart eventually indicated that his girlfriend had left the gun in the car. Stewart conceded that his fingerprints might be on the gun, as he had fired the gun at a gun range.

      After Stewart was under arrest, Ball continued searching the vehicle. Ball found a black bag in the trunk of the car that contained crack cocaine, powder cocaine, methamphetamine, and heroin. The trunk also contained $7,420, and Stewart's pockets contained $1,904.

      When Ball found the black bag, he told Stewart, "That's a lot of drugs, bud. Do you want to talk to a detective?" Dkt. No. 42-2 at 8. Stewart appeared to shake his head no. Ball responded, "You do not want to talk to a detective? Well, you understand I gotta have one come out." *Id.* Stewart responded, "Can you put me in a car? It's kinda cold out here." *Id.*

      After a few minutes, Ball told Stewart, "A detective's going to come talk to you. If you want to talk to him, that's up to you. I have a protocol to follow. You understand that? I wear this uniform, I may have a drug dog and do all this stuff, but we have to follow our procedures." *Id.* Stewart responded, "Can I sit in somebody's car? It's cold out here." *Id.* Sequin and

3

VanOeveren, whom Ball had contacted, then arrived at the scene.

Before taking Stewart to the police station, VanOeveren reminded Stewart of his *Miranda* rights and told Stewart that they had found narcotics, a gun, and a large sum of money in Stewart's car. Stewart responded that he was willing to meet detectives somewhere to try to assist them, but VanOeveren responded that it would not be possible for Stewart to be released. VanOeveren told Stewart that he had two choices: Stewart could come with detectives to the police station to discuss his situation, or he could go straight to the Marion County Jail. Stewart indicated that he wanted to go to the police station with detectives.

VanOeveren then transported Stewart to the police station. Because VanOeveren did not have a recording device or witness to the conversation, he did not speak with Stewart about the case during the car ride. At the police station, Stewart was taken to a room for an interview.[1] VanOeveren reviewed the *Miranda* warnings with Stewart, and Stewart again indicated that he understood his rights and wanted to speak with detectives. Stewart signed a written waiver of *Miranda* rights. Exhibit 3.

In August 2015, the grand jury indicted Stewart in a superceding indictment for possession with intent to distribute a controlled substance in violation of 21 U.S.C. ' 841(a)(1); possession of a firearm as a previously convicted felon in violation of 18 U.S.C. ' 922(g); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. ' 924(c); violation of the spending statute in violation of 18 U.S.C. ' 1957; and two counts of laundering of monetary instruments in violation of 18 U.S.C. ' 1956(a)(1)(B)(i). Dkt. No. 44.

---

[1] A video-recording of this interview was provided to the Court as Exhibit Five.

## II. DISCUSSION

In his Motion to Suppress Evidence, Stewart raises three issues. First, he challenges the traffic stop and resulting search of his car. Second, he challenges the post-arrest statements he made to police. Finally, he challenges the evidence obtained from the search warrant for his residence.

### A. Traffic Stop and Resulting Search

Stewart first argues that the traffic stop and resulting search of his car were impermissible. Ball stopped Stewart after Stewart failed to come to a complete stop at a red light.[2] The decision to stop an automobile is reasonable when the police have probable cause to believe that a person has committed even a minor traffic offense. *United States v. Taylor*, 596 F.3d 373, 376 (7th Cir. 2010). Ball's motivation in making the stop is irrelevant; whether the stop was due to Stewart's traffic violation or was pretextual is immaterial. *See Whren v. United States*, 517 U.S. 806, 813 (1996). The Government presented testimony, which the Court finds credible, that Stewart failed to come to a complete stop at the red light. Accordingly, the initial stop of the car and questioning of Stewart were supported by probable cause.[3]

Stewart also challenges the length of time he was detained for the traffic stop as unreasonable. He notes that he never actually received a ticket for failing to stop. Even a "seizure

---

[2] *See* Ind. Code 9-21-3-7(b)(3)(A).
[3] Some ambiguity exists in the record as to whether Ball himself saw Stewart fail to stop or whether he effected the traffic stop of Stewart based on VanOeveren's report that Stewart failed to stop at the red light. The Court need not determine whether Ball actually saw Stewart fail to stop. Under the collective knowledge doctrine, Ball could stop Stewart at VanOeveren's direction. *See United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (citation omitted) ("The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action.").

that is lawful at its inception" can "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citation omitted). In the context of a traffic stop, this means that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* Police may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). However, "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Caballes*, 543 U.S. at 410. Approximately fifteen minutes elapsed between the time Ball pulled Stewart over and Josie's alert. *See* Exhibit 7. During that fifteen-minute period, Ball was actively engaged in conducting the traffic stop.[4] When other officers arrived, Ball directed one officer to continue writing the ticket while Ball had Josie conduct an open air sniff. Thus, Ball did not prolong or extend the traffic stop beyond the time necessary to effectuate its purpose. Once Josie alerted, the encounter moved beyond that of a mere traffic stop, as probable cause to search the vehicle was established.[5]

Stewart also argues that the alert of the K9, Josie, failed to create probable cause to allow Ball to search the vehicle. Stewart claims that Josie is unreliable when confronted with real-

---

[4] *See United States v. Sharpe*, 470 U.S. 676, 686 (1985) (in determining the reasonable duration of the stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").
[5] Defendant's claim that Ball conceded that the traffic stop itself took no less than 34 minutes is not supported by Ball's testimony at the hearing. In fact, Ball testified that the entire encounter took approximately 34 minutes.

world distractions, pointing to the fact that Josie alerted on the passenger compartment, where no drugs were found, rather than on the trunk, which contained a package of drugs. The government posited that Josie alerted on the front driver's side door because the scent of narcotics was strongest there due to the hand-to-hand transaction that had just occurred in the passenger compartment of the car. As Michael Craig Patton, training supervisor for the Indianapolis Metropolitan Police Department canine unit and a canine trainer for 23 years, noted, the dog alerts on the scent of drugs, not drugs themselves. Thus, it was entirely plausible that if Stewart had just handled drugs as part of a hand-to-hand transaction and then opened the door, the scent would be stronger at the driver's side door than at the trunk, which contained drugs sealed in a package. No evidence adduced at the hearing suggested that the alert was due to any unreliability or handler error.[6] Stewart's hypothesis that Josie was tired from working all day was disproved at the hearing; in fact, Josie had been on duty for only approximately 45 minutes, and the stop of Stewart was her first of the day.

Stewart also claims that "Josie's testing and training records indicate instances of handler error" (Dkt. No. 33-1 at 3); however, Stewart fails to point to any such instances, and the Court's review of the records submitted by the Government as Exhibit 1 reveals none. Ball has been certified as a narcotics canine handler since 2005. He has been assigned to Josie since 2010, and they have been certified every year. He conducts training with Josie on a monthly basis, and he avers that there are no instances of handler error in all of Josie's testing and training records. Ball

---

[6] In his Memorandum in Support of Motion to Suppress, Stewart offers as an explanation for Josie's "error" in alerting on the car door rather than the trunk that "the narcotics allegedly located in the trunk compartment were not present when the free air sniff was performed." Dkt. No. 33-1 at 1. At the hearing, Stewart presented no evidence or argument to support this theory, and the Court finds no reason to give it any credence.

testified that Josie has alerted on vehicles in which no drugs have been found but explained that narcotics dogs alert on the scent, not presence, of drugs.[7] Further, Patton testified at the suppression hearing that Josie always had stood out to him as being exceptional in her reliability.

The Supreme Court has held that "[e]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 133 S. Ct. 1050, 1057 (2013). Josie was certified annually, and the copious training records demonstrate her reliability. Exhibit 1. No competing evidence was presented that would call into question Josie's overall reliability or her reliability with respect to this specific search.[8] To the contrary, Josie was described as exceptionally reliable.[9] Thus, Josie's "sniff was up to snuff," *Harris*, 133 S. Ct. at 1058, as her alert "would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime," *id.* As such, Josie's alert created probable cause to suspect that a search of the car would reveal

---

[7] The Supreme Court has found that a dog's field record is of "relatively limited import." *Florida v. Harris*, 133 S. Ct. 1054, 1056 (2013).

[8] The Supreme Court has instructed trial judges to hold a probable-cause hearing to assess whether the dog is adequately trained:
> If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause. If, in contrast, the defendant has challenged the State's case (by disputing the reliability of the dog overall or of a particular alert), then the court should weigh the competing evidence.

*Harris*, 133 S. Ct. at 1058.

[9] The Seventh Circuit found that the district court did not err when it found Lex, a narcotics detection dog, to be reliable, despite a "fair amount of evidence that Lex was at the back of the pack." *United States v. Bentley*, 795 F.3d 630, 636 (7th Cir. 2015). By contrast, here the evidence demonstrated that Josie was at the front of the pack.

contraband or evidence of a crime, allowing Ball to search Stewart's vehicle, including the trunk. *See United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) (citations omitted) ("When probable cause exists to search a vehicle, law enforcement agents are permitted to search all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments, containers, packages, and trunks.")[10] Thus, the traffic stop and resulting search did not violate Stewart's constitutional rights.

### B. Stewart's Statements to Police

Stewart also argues that statements were obtained from continued interrogation following his indication that he wished to remain silent. Stewart further argues that he was influenced, if not coerced, by narcotics detectives into speaking with them.

Stewart first claims that his post-arrest statements should be suppressed because he invoked his right to remain silent with Bell. After Stewart had been arrested and acknowledged that he understood his rights, Ball questioned Stewart about the handgun in the car, and Stewart answered his question. Then, upon discovering the narcotics in the trunk, Ball told Stewart, "That's a lot of drugs, bud. Do you want to talk to a detective?" Dkt. No. 42-2 at 8. Stewart appeared to shake his head no.   Ball told Stewart, "You do not want to talk to a detective? Well, you understand I gotta have one come out." *Id.* Stewart responded, "Can you put me in a car? It's kinda cold out here." *Id.* Ball again tried to clarify, telling Stewart, "A detective's going to come talk to you. If you want to talk to them, that's up to you. I have protocol to follow. You

---

[10] Because Josie's alert created probable cause to allow Ball to search the car, the Court need not determine whether Ball independently had probable cause to search based the information provided to him regarding Stewart's alleged participation in illegal drug trafficking, including VanOeveren's belief that he had seen Stewart conduct a hand-to-hand transaction that evening.

9

understand that? I wear this uniform, I may have a drug dog and do all this stuff, but, we have to follow our procedures. OK?" *Id.* Stewart stated, "Can I sit in somebody's car? It's cold out here." *Id.* Stewart further points out that Ball is heard calling for narcotics detectives, saying, "He doesn't seem like he wants to talk in the open, maybe if you sit him in a car he'll wanna (sic) talk, he originally said he didn't. He's been Mirandized and everything." Doc. 33-1 at 9; *see* Exhibit 7.

Stewart never affirmatively and unequivocally invoked his right to remain silent. *See Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (holding that a suspect must unambiguously invoke his right to remain silent before police must stop the interrogation). "[A]n ambiguous invocation of the right to remain silent does not require that the police cease all questioning." *United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006) (holding that a suspect telling a police officer that he's "not going to talk about nothin'" is not an unambiguous invocation of the suspect's right to remain silent). Here, Stewart apparently shook his head when asked if he wanted to speak with a detective. When Ball twice attempted to clarify, Stewart simply asked to be put in a car because of the cold. Such responses were not an unambiguous invocation of Stewart's right to remain silent such that officers were precluded from further questioning him. Stewart did not tell Ball that he no longer wished to answer Ball's questions. Nor did he explicitly state that he did not want to speak with detectives. As such, Stewart's argument on this ground must fail.

Stewart also claims that the "implication through the interrogation is that Stewart was told that the only way to avoid a life sentence [was] through cooperation." Dkt No. 33-1 at 9. During their interview with him, the detectives did tell Stewart that his sentence could be life and

that his cooperation and honesty would go a long way. However, the detectives never made a specific promise to Stewart and in fact refused to give specific numbers when pressed to do so by Stewart.

"[C]oercive police activity is a necessary predicate to [a] finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment." *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (internal quotation marks omitted). "A false promise of lenience is an example of forbidden [interrogation] tactics, for it would impede the suspect in making an informed choice as to whether he was better off confessing or clamming up." *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012) (quotation and citation omitted). "[W]hile a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible. Trickery, deceit, even impersonation do not render a confession inadmissible . . . unless government agents make threats or promises." *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009) (quotation and citation omitted). None of the statements made by detectives were a "solid offer of leniency," *id.* at 1129, such that any falsity would impede Stewart in making an informed choice.

Stewart also alleges that detectives told him that "this could all disappear" as they were driving to the police station. (Doc. 33-1 at 9). However, VanOeveren testified at the hearing that he was alone in the car with Stewart during the drive to police station and that he did not speak to Stewart about the facts of his arrest or the facts of the ongoing investigation. No evidence was presented to the contrary, and the Court finds VanOeveren's testimony credible. Further, the Advice of Rights form signed by Stewart at the police station acknowledged that "No promises or threats have been made to me and no pressure or coercion of any kind has been used against

11

me." Dkt. No. 42-3 at 2.

Nor does the evidence presented support Stewart's claim that "Officer Vanoverin [sic] told him that he could avoid being taken into custody by cooperating, and thereafter refused to allow him to leave and continue the conversation elsewhere." Dkt. No. 68 at 7. VanOeveren did offer Stewart the opportunity to go to the police station to talk rather than go directly to jail, but such an offer is not the same as an offer to avoid custody altogether.

Stewart also points to alleged "physical abuse and neglect" (Dkt. No. 68 at 7) due to being detained in cold weather and placed in the right front passenger seat where some of his peers might believe he might become an informant, possibly endangering him and his loved ones. While the weather may have been cold, Stewart points to no evidence that would rise to the level of physical abuse. Moreover, Stewart makes no credible argument that placing him in the front seat of the police car somehow amounted to coercion.

In sum, Stewart, who was familiar with the criminal justice system and was not physically threatened in any way, received and understood his *Miranda* warnings, waived the right to remain silent by making informed and uncoerced statements to the police, and did not unambiguously invoke his *Miranda* rights thereafter.

## C.  Search of Stewart's Residence

Finally, Stewart argues that the search warrant was defective because the supporting affidavit contained misleading omissions regarding statements made by Stewart. Specifically, Stewart points to the omission of Stewart's comments that the gun belonged to his girlfriend and Stewart's belief that his girlfriend left the gun in his car when she last drove it. Stewart alleges that these statements are material because, without them, the magistrate would have had to

conclude that Stewart not only was aware of the gun but also placed it where it was discovered. Stewart also points to the omission of Stewart's statement that he had fired the handgun at a firing range. The warrant included Stewart's statement that he had fired the gun but was unsure whether his fingerprints would be on the gun. Stewart alleges that the omitted statement regarding the firing range was material because the magistrate could have believed that Stewart had discharged the gun in his backyard or during the commission of a crime.

"The Fourth Amendment requires that, absent certain exceptions not applicable here, police must obtain a warrant from a neutral and disinterested magistrate before commencing a search." *United States v. Robinson*, 546 F.3d 884, 887 (7th Cir. 2008) (citation omitted). No warrant shall issue unless there is probable cause, as typically set forth in a warrant affidavit, to justify the search. *See* U.S. Const. amend. IV. Probable cause is established when, in light of the totality of the circumstances, the issuing judge can make a practical, common-sense determination that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

If a defendant at a *Franks* hearing establishes by a preponderance of the evidence that the false statements or omissions were made intentionally or with reckless disregard for the truth, and without the false material the affidavit's remaining content is insufficient to establish probable cause, the search warrant is invalid and the fruits of the search must be excluded from evidence. *Franks v. Delaware*, 438 U.S. 154, 156 (1978). In this case, incorporating the omitted facts into the affidavit would not have altered the probable cause determination. The omitted statements about the gun are not misleading. According to the facts presented, Stewart was a felon, and a gun was found next to him in the car. Further, a black duffle bag with drugs was

found in the trunk of the car. Even had the affidavit made no mention of the gun, probable cause to search Stewart's residence would have existed. The omissions are not misleading and are not material to a finding a probable cause to search Stewart's residence. Probable cause would have existed even had the omitted material been included in the affidavit.

Finally, Stewart argues that the information from the search warrant was fruit of a poisonous tree because it was based on an illegal stop, illegal open air sniff, illegal search of Stewart's vehicle, and coerced statements. However, as previously explained, none of these earlier events were unconstitutional. As such, the information was not fruit of the poisonous tree, and the search warrant was not defective on those grounds.

## CONCLUSION

For the foregoing reasons, the Defendant=s Motion to Suppress Evidence (Dkt. No. 33) is **DENIED**.

SO ORDERED: 10/27/15

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification