UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **REDACTED TRANSCRIPT** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:15-cr-0024-WTL-DKL |
| | ) | Indianapolis, Indiana |
| DANIEL STEWART, | ) | Wednesday, October 7, 2015 |
| | ) | 10:24 o'clock a.m. |
| Defendant. | ) | |

Before the
HONORABLE WILLIAM T. LAWRENCE

TRANSCRIPT OF EVIDENTIARY HEARING

APPEARANCES:

FOR THE GOVERNMENT:  United States Attorney's Office
By:  Michelle Brady
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204

FOR THE DEFENDANT:  Attorney at Law
By:  Carl Louis Epstein
Inland Building
156 East Market Street
Suite 900
Indianapolis, Indiana 46204

ALSO PRESENT:  The Defendant in person.

COURT REPORTER:  Jean A. Knepley, RDR, CRR, CRC, FCRR
46 East Ohio Street, Room 309
Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

2

1                    I  N  D  E  X

2   SGT. CRAIG PATTON

3   Direct Examination by Ms. Brady .................5
    Cross-examination by Mr. Epstein ...............15
4
    RYAN VANOEVEREN
5
    Direct Examination by Mr. Epstein .............23
6   Cross-examination by Ms. Brady ................45
    Redirect Examination by Mr. Epstein ...........58
7
    BRADY BALL
8
    Direct Examination by Mr. Epstein .............59
9   Cross-examination by Ms. Brady ................77
    Redirect Examination by Mr. Epstein ...........80
10
        Certificate of Court Reporter ............85
11

12

13                I N D E X   O F   E X H I B I T S

14  DESCRIPTION                          RECEIVED

15  6 ..............................................5
    7 ..............................................5
16

17

18

19

20

21

22

23

24

25

1                   (In open court.)

2          THE COURT:  We are on the record on Cause No.

3 1:15-cr-24, United States of America versus Daniel Stewart.

4       Representing Mr. Stewart is Mr. Epstein.  Good morning to

5 you.

6          MR. EPSTEIN:  Good morning, Your Honor.

7          THE COURT:  For the Government, Miss Brady.  Good

8 morning.

9          MS. BRADY:  Good morning, Your Honor.

10         THE COURT:  We are here as a result of a motion to

11 suppress that was filed for and on behalf of Mr. Stewart by

12 Mr. Epstein.  The Court has read and reviewed the motion, the

13 response, and the reply, as well as the accompanying exhibits

14 and is ready for a hearing in that regard.  The Government

15 having the burden of persuasion, the Court will acknowledge

16 that they should go first as a result at least of the initial

17 search here was without a warrant.  So Ms. Brady, how do you

18 wish to proceed?

19         MS. BRADY:  Your Honor, I would first ask that the

20 Court take note of the five exhibits that were filed by the

21 United States in its response to the motion to suppress:

22 Exhibit 1, which would be the training records of Detective

23 Brady Ball; Exhibit 2, which is the draft transcript of the

24 traffic stop that occurred on January 20, 2015; Exhibit 3,

25 which was the written waiver of Miranda rights that was signed

4

by the Defendant on January 20, 2015; Exhibit 4, that was the
state search warrant that was obtained for the Defendant's
residence on January 20, 2015; and then Exhibit 5.  That was a
DVD containing the audio and video recorded post Miranda
statement of the Defendant in an interview conducted by
Detectives Ryan Clark and Ryan VanOeveren of the Indianapolis
Metropolitan Police Department.

   THE COURT:  Very well.  The Court will accept those
as previously filed and as evidence for the Government in this
regard as to the response to the motion to suppress.  Anything
else?

   MS. BRADY:  Your Honor, I would supplement the
record at this point with a brief declaration that has been
signed by Detective Brady Ball, a copy of which has previously
been shown to defense counsel.  That brief declaration
references the audio of the traffic stop, the draft transcript
of which has already been submitted to the Court.  I would ask
to admit those as Government's Exhibits 1 and 2 for purposes
of this hearing.

   THE COURT:  Let's do those as 6 and 7.

   MS. BRADY:  Six and 7.  Yes, Your Honor.

   THE COURT:  Mr. Epstein, in that regard?

   MR. EPSTEIN:  No objection, Your Honor.

   THE COURT:  Very well.

   MS. BRADY:  May I approach, Your Honor?

1   THE COURT:  You may.  Show 6 and 7, for purposes of

2   this hearing only, admitted without objection.

3              *(Government's Exhibit 6 was*

4               *received in evidence.)*

5              *(Government's Exhibit 7 was*

6               *received in evidence.)*

7              MS. BRADY:  Thank you, Your Honor.

8              THE COURT:  Thank you.

9              MS. BRADY:  And then finally if I may, Your Honor, I

10  would call Sgt. Craig Patton of IMPD as a witness to further

11  establish the reliability of the narcotics detector dog in

12  question in this case.

13             THE COURT:  Very well.

14             MS. BRADY:  Thank you, Your Honor.  The United

15  States would call Sgt. Patton.

16       **SGT. CRAIG PATTON, GOVERNMENT'S WITNESS, SWORN**

17                    **DIRECT EXAMINATION**

18  BY MS. BRADY:

19  Q    Thank you, Your Honor.  I apologize.  Could you state

20  your full name for the record, please?

21  A    Full name is Michael Craig Patton, P-A-T-T-O-N.

22  Q    And, sir, how are you employed?

23  A    I am sorry?

24  Q    How are you employed?

25  A    I am the training supervisor for the Indianapolis

1  Metropolitan Police Department canine unit.

2  Q    How long have you been with IMPD or formerly IPD?

3  A    I just completed my 30th year.

4  Q    And, sir, how long have you been involved in the training

5  of dogs?

6  A    I have been in the canine unit for 26 years.  I have been

7  a trainer for 23 of those years.

8  Q    And you indicated you have been a trainer for 23 years.

9  What does that encompass, sir?  What does it mean to be a

10 trainer?

11 A    I am responsible for the maintenance training, the

12 proficiency training, the initial training of our -- all of

13 our dogs to include patrol dogs, explosive detection dogs,

14 narcotics detection dogs.

15 Q    If I could narrow your focus a little bit to the area of

16 narcotics detector dogs, what kind of training and

17 certification goes along with any narcotics detector dog that

18 would be used by IMPD?

19 A    The Indianapolis Police Department has an annual

20 certification which is a NOR test which is based off the ATF's

21 National Odor Recognition test wherein the dogs are exposed to

22 a series of blank hides, distracter hides, and then the actual

23 training aids of narcotics.

24 Q    What is a blank hide?

25 A    A blank hide would be a can that has nothing in it.

Case 1:15-cr-00024-WTL-DKL Document 21874 Filed 03/02/16 Page 7 of 85 PageID #: 548

1  Q    What is a distracter hide?

2  A    A distracter could be anything.  We use -- we try to use

3  things that have some sort of what we believe as humans to be

4  odor to it like pencils, markers, crayons, could be paper

5  rolled up, could be a number of things.

6  Q    And this is an annual certification that occurs?

7  A    Yes.  The certification is annual.  The handlers are also

8  required to attend monthly proficiency training as well.

9  Q    And what does it take for a dog to be certified in this

10 annual certification process?  What are the requirements, I

11 should say?

12 A    For just the annual certification, the dogs are

13 allowed -- the cans are placed in a circular formation, and

14 the dog is allowed to go around that perimeter of the cans to

15 check each can two times.  Once the dog -- the dog cannot have

16 a false indication or indicate on a blank or distracter that

17 is not a narcotics training aid.  If they do, they fail the

18 test.  What the objective is for them to locate the items that

19 they are trained on; in this case, narcotics training aids,

20 and the dog -- the handler has to recognize the dog's behavior

21 change and let the training staff know by saying the word

22 odor, that that dog has recognized that can as a training aid

23 so that we can let them know whether that is, in fact, the

24 training aid that they are supposed to locate or not.

25 Q    Are all the dogs certified each year, or does it happen

1  that some dogs fail certification on occasion?

2  A     Yes.  We have approximately, with our department and

3  other agencies, we have approximately 48 dogs that train with

4  us.  So they are all required to attend the annual

5  certification.  However, not all the dogs pass the

6  certification.

7  Q     Now, if I could back up just a little bit, you indicated

8  you're a trainer.  What training did you receive to become a

9  trainer of these narcotics detector dogs and other police

10 dogs?

11 A     When I was initially assigned to the canine unit for the

12 police department I spent the first two years working the

13 street, and because I was a younger person, the trainers were

14 older, asked me if I was interested in that.  I have attended

15 hundreds and thousands of hours of training schools.  I

16 currently also am a contractor with the United States

17 Department of Defense as a canine subject matter expert,

18 specifically for the CTTSO division out of Washington DC,

19 which is Combating Terrorism Technical Support Office.

20 Q     Now, have you ever testified in either state or federal

21 court as an expert in this area of canine -- police canines?

22 A     Yes, many times.

23 Q     Okay.  In fact, you have testified on multiple occasions

24 in this courthouse; have you not, as an expert?

25 A     Yes.

1  Q    Okay.  Now I believe you also mentioned that in addition

2  to the annual certification that all IMPD dogs are subjected

3  to, you indicated there was also a monthly training; is that

4  correct?

5  A    Yes.  We refer to it as monthly proficiency training so

6  that we can ensure that the dogs are trained the way they are

7  supposed to do and they are maintaining that through their

8  proficiency.

9  Q    And the records that are before the Court of -- are you

10 familiar with Josie, the canine?

11 A    Yes.

12 Q    The records that are currently before the Court as

13 Government Exhibit 1 also seem to indicate in addition to the

14 annual certification and the monthly training some more

15 frequent training that occurs sometimes multiple times in a

16 week but certainly more frequently than monthly that appear to

17 be conducted by the detective with his dog and there are some

18 annotations.  Is that something you would expect to see, that

19 a dog handler would, in addition to the annual certification,

20 in addition to the monthly training, would also have this more

21 frequent training occur as well?

22 A    Yes.  There are a recommended minimum amount of time that

23 officers should train with their dogs; however, on the

24 Indianapolis Police Department we do not try.  In fact, we do

25 not train to just what the minimum is that is required.  We

1  always –– I, as the supervisor, always require more of the

2  officers in all the fields the dogs are trained in.

3  Q     Now, with these records again before the Court, it does

4  appear that your name appears very frequently as the training

5  supervisor.  I believe you did indicate you are familiar with

6  Josie, the IMPD canine?

7  A     Yes, I am.

8  Q     And are you familiar with Detective Brady Ball, the

9  canine handler?

10  A     Yes, I am.

11  Q     Through your training and experience, as well as through

12  your familiarity with Josie and Detective Ball as the training

13  supervisor, do you have an opinion as to the reliability of

14  Josie as a narcotics detector dog?

15  A     Yes.

16  Q     What is that opinion, sir?

17  A     My opinion of Josie and also Brady Ball as a canine team

18  is that they are not just reliable, but I would put them in

19  the category of extremely reliable in that this dog –– I have

20  so many dogs.  This is one dog that has always stuck out to me

21  as being exceptional in its reliability.  If we have problems

22  with a dog, either during training or a handler brings

23  something to our attention, we will give the dog remedial

24  training to improve the dog's behavior.  And if it doesn't

25  improve, the dog is taken out of the program.  So we go to

1  great lengths to ensure that the dogs that are assigned to the

2  Indianapolis Police Department are reliable.  If they are not,

3  they are taken out of the program.

4  Q    Now you have become somewhat familiar with the facts

5  surrounding the arrest of the Defendant before the Court,

6  Daniel Stewart, which occurred on January 20, 2015; have you

7  not?

8  A    Yes.

9  Q    Okay.  And specifically you have reviewed the declaration

10 of Detective Brady Ball that was submitted to the Court as

11 Government's Exhibit 6, correct?

12 A    Yes.

13 Q    I would like to ask you a few questions.  If those, in

14 fact, would be the facts before the Court, one of the claims

15 that is made by the defense today is that the dog, Josie,

16 circled the car three times before alerting on the front door

17 of the vehicle.

18     Does that seem excessive to you?

19 A    No.

20 Q    Can you talk to us a little bit about is there any

21 significance that could be or should be drawn from a dog

22 circling three times?

23 A    Yes.  There could be a number of reasons a dog would

24 circle a car multiple times.  Typically most all of the dogs

25 will go around the car at least once before they start

1   actually processing what they are going through.  Some dogs

2   work quicker than others.  So in this case, if a dog were

3   taken around a car by the handler or the dog was just allowed

4   to go around the car for the handler, it is not uncommon at

5   all for a dog to go around a car two, three, maybe even four

6   times.

7   Q    Now I would also like to ask, as you know from reviewing

8   the facts, the dog Josie alerted to the front door of the

9   vehicle, but the narcotics that were found by Detective Ball

10  were in the kind of rear quarter panel trunk area of the car.

11  Sergeant, doesn't it stand to reason if the drugs were in the

12  trunk of the car, isn't that where the dog should have

13  alerted?

14  A    No.

15  Q    Why not?

16  A    It is possible that if they are in the trunk that a dog

17  will alert to the trunk.  However, in a compartment the size

18  of a vehicle, the things that we cannot take into account or

19  know are which way the breeze is blowing, air temperature,

20  barometric pressure, whether the heat is on in the car,

21  whether the air conditioning is on in the car, whether windows

22  are down.

23       There is a lot of things that push scent to a dog that

24  aren't necessarily in that exact same spot.  For example, if a

25  dog indicates on the front of a vehicle, those narcotics could

1  very well be in the back.  The dog is not trained to detect

2  narcotics.  They are trained to detect the odor that narcotics

3  give off or emanate.  So it is not uncommon at all in a, in a

4  vehicle for a dog to not pinpoint exactly where it is because

5  once they get the scent that they are trained on, typically

6  that is where the dog is going to show the behavior change and

7  then the indication.

8  Q    Now again, referring to the facts of this particular

9  case, as I believe you are aware, a couple of narcotics

10 detectives had followed the Defendant from his home and saw

11 what they believed to be a hand-to-hand transaction, drug

12 transaction inside the passenger compartment of the vehicle.

13 The other party to that believed hand-to-hand exited the

14 vehicle, and the Defendant drove off and was stopped a short

15 time later.

16     Would that also potentially affect where the dog would

17 alert on the vehicle if, in fact, a hand-to-hand transaction

18 had just occurred in the passenger compartment and if one of

19 those parties to the transaction had just exited the vehicle,

20 thus handling the driver's side door?

21 A    Yes.  And the way I would explain that, Your Honor, is if

22 you have someone who has recently handled something that the

23 dog was trained on; in this case, narcotics, and that person

24 has to use the door handle to get in and out of the car or

25 that person touches the side of the door for support, whatever

1   the case may be.  It is very, very likely that the dog will

2   indicate and maybe the first place that they detect the odor,

3   where it may be strongest to them, the amounts of narcotics

4   don't always come into play as far as I think as human beings

5   we feel that dogs will always find, go pinpoint the largest

6   amount, and that is not necessarily the case.  They may get

7   what is strongest to them at the time or the first thing that

8   they recognize as something that they have been trained on as

9   an odor, and that is where they will show their behavior

10  change and their indication.

11  Q    One final question if I may, Sergeant, is there any

12  practice or procedure in place?  I would like to specifically

13  refer to narcotics dogs doing a sniff of a vehicle,

14  specifically a vehicle.  Once that dog alerts, is there any

15  training and procedure in place for IMPD dog handlers?  Do

16  they continue to run the dog to see if the dog will alert on

17  multiple spots on the vehicle, or once there is a single

18  alert, is that the end of the inquiry based on training that

19  has been received through your office?

20  A    If a dog is searching a vehicle, for example, in this

21  case, and that dog shows the behavior change and then the

22  indication, the first thing is I prefer my, the handlers that

23  I train, not to reward the dog at that time with anything

24  other than praise because at that point you don't really know

25  what the dog is indicating on.  And the other thing is, once

1    that dog has shown an indication and their behavior change and

2    then their indication, once that has been established and the

3    handler recognizes that and we establish that through training

4    initially, that search should cease at that point or that

5    sniff with the dog should cease at that point because you have

6    what you need from the dog.

7          MS. BRADY:  No further questions.  Thank you for

8    your time.

9          THE COURT:  Thank you.

10      Mr. Epstein, questions?

11          MR. EPSTEIN:  Yes, Your Honor.

12                      **CROSS EXAMINATION**

13   BY MR. EPSTEIN:

14   Q    When was it when you actually participated in the

15   training of the dog in this case?

16   A    In reference to Josie?

17   Q    Yes.

18   A    Because I have so many dogs, I probably can't tell you

19   exact dates, but I believe because Officer Ball had a dog

20   prior to Josie that he had that was a narcotics dog and that

21   dog retired, so I believe that this dog has probably been in

22   our program for probably about five years.

23   Q    And when would be the last time you would have observed

24   Josie during the training process and recertification process?

25   A    Okay, sir, those are two questions.  When was the last

1  time I observed him in training?

2  Q     Yes.

3  A     I would say if this is October, we are actually training

4  narcotics dogs yesterday and today.  So probably July or

5  August is a guess.

6  Q     That would have been after the occurrence in this

7  particular case; is that correct, which would have been in

8  January of 2000 --

9  A     Yes, that would be after.

10 Q     And on the last occasion that you saw Josie, did you

11 observe Josie's performance in terms of reliability and being

12 able to do the tasks that are asked?

13 A     Yes.

14 Q     And what did you observe particularly?

15 A     I don't recall exactly where we were training at or what

16 we had to do.  Wherever the training is set up for that

17 particular thing, I would also add that I have two assistant

18 trainers that assist me with narcotics detection.  So if we

19 are running multiple dogs on multiple exercises, they may be

20 with that particular trainer at that time or during that

21 month.  But like I say, I -- nothing sticks out that I

22 observed.  The only thing that would stick out is if I had

23 observed the dog not performing up to standards.

24 Q     When would have been the most recent time you would have

25 observed Josie prior to January of 2015?

1  A    Probably November of 2014.

2  Q    That would be about three months prior or so?

3  A    Two.  We don't train in December, but if I would have

4  seen the dog, if this occurred in January then we would have

5  had training in November.

6  Q    And again, you don't necessarily work with individual

7  dogs or people you delegate the process to and supervise that;

8  is that correct?

9  A    On occasion.  I still am very involved with the training

10 and observe the dogs, but I don't want to testify in court

11 that I definitely saw Josie doing something on a particular

12 day when, in fact, that particular time maybe one of my

13 assistant trainers was with that dog.

14 Q    What information do you have as we sit here today to say

15 that Josie never failed in doing a dog sniff of some kind or

16 another or was never unreliable?

17 A    Are you talking about in training?

18 Q    Yes.

19 A    Because of my training records, they are meticulous.

20 Q    Do you have those with you today?

21 A    I do not.

22 Q    Okay.  And do you remember when the last time -- when did

23 you begin training Josie approximately?

24 A    Again, I am not entirely sure when we got Josie.  So if I

25 would say that we have had that dog approximately five years,

1  as soon as we get that dog, that dog would have to go through

2  an initial training course before we would allow it to be

3  certified.

4  Q    That might be as much as five years before the incident

5  in this case, right?

6  A    If the question is when was the first time I worked with

7  Josie?

8  Q    Yes.

9  A    Would have been when we got the dog.  So if it was five

10  years ago, then the first time I would have worked with her

11  would have been five years ago.

12  Q    Then with respect to Officer Ball's personal involvement

13  with Josie for reinforcement of training, do you personally

14  observe those occurrences?

15  A    A lot of them I do.  I set up the training, but they are

16  also required to do training on their own as well.

17  Q    You don't visit his home when he is working with Josie at

18  home in the yard or something like that?

19  A    No.

20  Q    And then you weren't at the scene of the police officers'

21  encounter with Daniel Stewart, were you?

22  A    No.

23  Q    Did you visually observe Josie at the scene?

24  A    No.

25  Q    Can you speak to whether it was actually Josie at the

1  scene other than by the basis of the officer's

2  representations?

3  A     No.  I was not there.

4  Q     Okay.  Does weather affect dogs in terms of their ability

5  to indicate a positive or a negative on a vehicle?

6  A     Can you explain the question?

7  Q     Would freezing temperatures affect a dog's ability to

8  indicate positively or negatively in terms of location of

9  drugs or contraband in a vehicle?

10  A     Without being there -- I mean, it is possible, but it is

11  not likely.

12  Q     You indicated during the course of your testimony that

13  somebody entering the vehicle who had touched narcotics could

14  theoretically cause the dog to indicate positively in a

15  different location on the vehicle; is that right?

16  A     Yes.

17  Q     And in this particular incident do you have any awareness

18  that the person who actually introduced narcotics into the

19  vehicle would have handled the narcotics?

20  A     No, sir.  I have testified that I was not on the scene.

21  I didn't observe any of that.

22  Q     So you wouldn't know whether Daniel Stewart had handled

23  narcotics, and you wouldn't know whether the individual who

24  ostensibly got into the vehicle to do a controlled buy with

25  them had handled narcotics?

1  A    I would not.  I can only testify to the reliability of

2  Josie.

3  Q    When it is a controlled buy circumstance, you are

4  familiar with that type of a situation?

5  A    I am sorry, can you repeat, sir?

6  Q    Are you familiar with controlled buys and how they are

7  conducted?

8  A    I am not.

9  Q    Let's assume that Daniel Stewart arguably was selling

10 contraband to the individual who got into the car with him.

11 Would you know whether or not that individual had actually

12 handled the contraband at that point in time?

13 A    No.

14 Q    And are you aware that contraband is frequently packaged

15 for sale and distribution?

16 A    I am sure that it is.

17 Q    Okay.  So you don't know whether the contraband would

18 have been directly handled by anybody who was involved that

19 day?

20 A    No.

21 Q    And, in fact, if you have read through the documents

22 concerning this case, there is no way of telling without

23 Officer Ball being here or the other officer who is involved

24 in observing the controlled buy whether or not they were at a

25 vantage point where they could actually observe contraband

1  being exchanged, can you?

2  A    No.

3  Q    You're saying in terms of where the dog might stop and

4  sniff or indicate positive, the size of the vehicle might have

5  something to do with that?

6  A    I didn't say the size of the vehicle would have something

7  to do with that.  I said if you are talking about one vehicle,

8  whether it is a subcompact or a sedan or whatever, if it is

9  one compartment, then the dog could indicate in an area that

10  was not exactly where that particular contraband or the odor

11  that it was giving off was.

12  Q    Okay.  And in this particular case, where did the dog

13  indicate positive, Josie?

14  A    My understanding from the documents is, it was a door

15  handle or the side of a door.

16  Q    Do you know which of the doors it was?

17  A    Do not.

18  Q    Volkswagen is a two-door vehicle; is that correct?

19  A    I am sorry?

20  Q    This Volkswagen was a two-door vehicle; is that correct?

21  A    I have no idea.  I cannot speak to what the vehicle was

22  or whether a Volkswagen is a two-door or not.

23  Q    So the only basis you have for knowing any information

24  about where the dog might have indicated positive would be

25  what was supplied to you by Officer Ball; is that correct?

1  A    It was not supplied to me by Officer Ball, no.

2  Q    By the United States Attorney in this case; is that

3  correct?

4  A    Yes.

5  Q    It is not anything that you would have observed

6  personally?

7  A    No.

8  Q    Not anything that you would have talked to any of the

9  officers about who are involved in this case?

10 A    No, sir.

11 Q    No photographs shown to you, right?

12 A    No photographs.  No, no photographs.

13 Q    No videos shown to you?

14 A    No.

15          MR. EPSTEIN:  Okay.  I have nothing further, Your

16 Honor.

17          THE WITNESS:  Thank you.

18          THE COURT:  Redirect?

19          MS. BRADY:  No.  Thank you, Your Honor.

20          THE COURT:  You may step down.  Thank you.

21          THE WITNESS:  Thank you, Your Honor.

22                     (Witness excused.)

23          THE COURT:  Further witnesses from the Government,

24 Miss Brady?

25          MS. BRADY:  No.  Thank you, Your Honor.

1        THE COURT:  Very well.

2     Mr. Epstein, witnesses?

3        MR. EPSTEIN:  There is an Officer VanOeveren

4  available today, Your Honor.

5        MS. BRADY:  Your Honor, just to confirm, Sgt. Patton

6  may be excused?

7        MR. EPSTEIN:  He may.

8        THE COURT:  Yes.

9     **RYAN VANOEVEREN, DEFENDANT'S WITNESS, SWORN**

10                   **DIRECT EXAMINATION**

11        THE COURT:  Your witness, Mr. Epstein.

12        MR. EPSTEIN:  Thank you, Your Honor.

13  BY MR. EPSTEIN:

14  Q    State your name for the record, please.

15  A    It is Ryan VanOeveren.

16  Q    What is your position?

17  A    A detective with the Indianapolis Metropolitan Police

18  Department.

19  Q    And how long have you been a detective?

20  A    I am in my 16th year.

21  Q    And are you involved in drug enforcement?

22  A    I am.

23  Q    And how long have you been involved in drug enforcement?

24  A    On IMPD since 2004.

25  Q    And how long have you -- what kind of training did you

1  receive?

2  A    I attended the IMPD police academy, which was back then

3  in 2000 was IPD police academy.  I also attended the IMPD

4  narcotics school.  I have been an instructor at the IMPD

5  narcotics school.  I have had several in-services and classes

6  I have taken on drug interdiction as well as drug trafficking

7  at multiple levels.

8  Q    And did you become involved in an investigation

9  pertaining to Daniel Stewart?

10  A    Yes.

11  Q    And when did you first become involved in that

12  investigation?

13  A    Early parts of 2014.

14  Q    Okay.  And that was before the date of the actual stop

15  and search of his vehicle; is that correct?

16  A    Yes.

17  Q    That was an ongoing investigation?

18  A    Yes.

19  Q    And what did the investigation consist of leading up and

20  to the point of the stop, of the vehicle stop?

21  A    We believed that Mr. Stewart was a customer of Geraldo

22  Colon, who was a suspected drug trafficker.

23  Q    And what caused you to have that belief?

24  A    Multiple things.  Surveillance, information, research

25  that we have done, background on Mr. Stewart and other people

1  associated with him.

2  Q    Okay.  And initially, did that investigation begin with

3  just a hunch or was an informant of some type or another?

4  A    It was an extension of another case.

5  Q    Okay.  The other case was a case where you took

6  historical information; would that be accurate?

7  A    I guess it is all historical if it is in the past.

8  Q    Were there informants involved in the other case that

9  provided this information to you?

10 A    No.

11 Q    So what caused you to investigate that previous case?

12          MS. BRADY:  Objection, Your Honor.  Relevance.

13          THE COURT:  What caused him to investigate --

14          MR. EPSTEIN:  The case that was the basis for them

15 starting an investigation of Mr. Colon and Mr. Stewart in this

16 case.

17          THE COURT:  Sustained.  Next question.

18          MR. EPSTEIN:  Okay.

19 BY MR. EPSTEIN:

20 Q    With respect to Mr. Stewart, what type of undertakings

21 did you do when you were conducting your investigation of him?

22 A    Detailed information off computer programs, both on the

23 Internet, Google searches, conducted a substantial amount of

24 surveillance which is why we are here.

25 Q    With respect to the surveillances, where were they

1  conducted?

2  A    Initially Mr. Stewart was identified and observed at the

3  Venue Mall on Lafayette Road.

4  Q    And when would that have been approximately?

5  A    It was in the, maybe the fall of 2014, somewhere in that

6  range.

7  Q    And then did anything occur on that occasion that was

8  drug related?

9  A    No.

10  Q    Was he just shopping there?

11  A    That I don't know.

12  Q    Then why on that particular day did you go and conduct a

13  surveillance of Mr. Stewart?

14  A    Well, as part of an ongoing criminal investigation we

15  were conducting surveillance at the Venue Mall.

16  Q    Were there other surveillances conducted?

17  A    At the Venue Mall?

18  Q    No, other places.

19  A    Yes.

20  Q    Where did they extend to?

21  A    ████████████████████.

22  Q    And that would be an apartment where Mr. Stewart was

23  staying?

24  A    Yes.

25  Q    And what would the dates of those surveillances have

1    been?

2    A    I couldn't give you the exact dates preceding

3    January 20th, but between the fall of 2014 and January 20th

4    there was probably upwards of four to six particular

5    incidences where we specifically sat at that location and

6    attempted to observe Mr. Stewart.

7    Q    And on those occasions did you observe other than on

8    January 20th anything other than what you thought might have

9    been a controlled drug transaction?

10   A    No.

11   Q    Or a drug transaction of any kind?

12   A    Not pertaining to Mr. Stewart, no.

13   Q    So why did you resume your investigation up until

14   January 20th, 2015?

15   A    Basically the surveillance was established there and the

16   attempts to follow Mr. Stewart and find out his interactions

17   with primarily Geraldo Colon.  That was the goal.

18   Q    Leading up until –– let me restate that.  From fall of

19   2014 until January 20, 2015, did you actually observe Mr.

20   Stewart in transactions or interactions with Mr. Colon?

21   A    No.

22   Q    Okay.  On January 20, 2015, what time of the day was it

23   that you began your surveillance of Mr. Stewart?

24   A    Approximately 5:00 p.m.  Sometime in the evening.

25   Q    And what were the lighting conditions while you were

1  conducting your observation of Mr. Stewart?

2  A    Initially it was light out, and then it became dusk as

3  Mr. Stewart left the apartment complex.

4  Q    So it had become dusk by the time he left the apartment

5  complex?

6  A    Becoming dusk.

7  Q    And what were the lighting conditions at the apartment

8  complex itself?  Was it well lit?

9  A    I would say so.

10 Q    And were you alone when you were conducting your

11 surveillance of Mr. Stewart?

12 A    No.

13 Q    Who was with you then?

14 A    Detective Jeff Sequin and Detective Scott Childers.

15 Q    Were they in the same vehicle as you?

16 A    Detective Jeff Sequin was with me, and Detective Childers

17 was not.  He was in a separate vehicle.

18 Q    Did you proceed at some point to follow Mr. Stewart?

19 A    Yes.

20 Q    What course did you pursue?

21 A    The vehicle we believed Daniel Stewart to be driving?

22 Q    Yes.

23 A    White Volkswagen with a personalized University of

24 Indianapolis license plate that said ELEETE on the back of it.

25 Eleete was spelled not like the standard way of spelling

1   elite, but it was E-L-E-E-T-E.  That vehicle had left, and it

2   was followed to the Shell gas station at 46 and Lafayette

3   Road.

4   Q    And again, the conditions were at least dusk by that

5   point in time; is that correct?

6   A    It was still light enough to see.

7   Q    And you observed Mr. Stewart pull into the gas station?

8   A    I did.

9   Q    And where did you place your vehicle, and where did

10  Detective -- was it Sequin?  I mean, I am sorry, Childers

11  place his vehicle at that point in time?

12  A    Mr. Stewart pulled into the Shell station and parked at

13  the gas pump, which would be facing northbound on Lafayette

14  Road at the pump in that direction.  I drove through the

15  traffic light into the parking lot across Lafayette into the

16  shopping center and pulled right up to Lafayette Road and

17  watched them at a direct line of sight to Mr. Stewart.

18  Q    Was the volume of traffic along Lafayette Road at that

19  point in time?

20  A    Yes.

21  Q    And while you were conducting your surveillance of Mr.

22  Stewart did you take any videos of what transpired?

23  A    No.

24  Q    And approximately how many feet would you have been in

25  the vehicle you were riding in from the vehicle where Mr.

1 Stewart was at the gas pumps?

2 A    I would estimate the distance to be maybe 80 yards to 100

3 maybe.

4 Q    Kind of like a football field, right?

5 A    Yeah, maybe, maybe inside a football field.  That is why

6 I said 80 yards or so.

7 Q    Were there any vehicles positioned between your vehicle

8 and Mr. Stewart other than those that were passing in traffic?

9 A    No.

10 Q    What kind of vehicles was -- what kind of windows did Mr.

11 Stewart have on his vehicle?

12 A    They were tinted.

13 Q    And what degree of tint did you observe those windows to

14 be?

15 A    Very dark.

16 Q    So you couldn't actually visually observe what was going

17 on inside the vehicle, could you?

18 A    No.

19 Q    That would probably have been true of the other officers

20 who accompanied you; is that correct?

21 A    I am sorry, I couldn't hear you.

22 Q    That would probably have been true of the other officers

23 who accompanied you; is that correct?

24 A    That's correct.

25 Q    Sorry, Your Honor.

1    With respect to January 20th you have maintained, as well

2  as other officers who were with you, that based on your

3  experience and training, you observed what you felt was a drug

4  transaction between Mr. Stewart and somebody entering the

5  vehicle; is that right?

6  A    Yes.

7  Q    Can you identify by appearance the individual who entered

8  the vehicle?

9  A    No.

10 Q    You wouldn't know whether the person was a black male or

11 a white male or a female?

12 A    He was a black male.

13 Q    You didn't know who the individual was?

14 A    No.

15 Q    Did you see the black male approaching Mr. Stewart's

16 vehicle?

17 A    I did.

18 Q    And where was he approaching from?

19 A    He had parked a gray type vehicle.  I believe it was a

20 four-door, which would be I guess the south side of the Shell

21 station, and he walked across the parking lot to where Mr.

22 Stewart was parked at the gas pump and then entered the

23 passenger door and then shut the door.

24 Q    Now, in terms of the distance between that individual's

25 vehicle, the Ford, was he further away from your vehicle than

1  Mr. Stewart's vehicle or closer to your vehicle?

2  A    The subject that got into the passenger seat?  He was

3  closer than I was.

4  Q    And was there anything particularly suspicious about him

5  that led you to believe at the point of his approaching Mr.

6  Stewart's vehicle that he was about to engage in a

7  drug-related transaction?

8  A    Well, I found it odd that he walked directly to the

9  passenger door and just opened it and got in.  That is what

10  drew my attention to it being odd.

11  Q    It is unusual that people get into the passenger door of

12  somebody else's vehicle if they encounter them somewhere in a

13  common area?

14  A    Yes.  In my opinion, yes.

15  Q    Was there anything else suspicious based upon your

16  experience as a law enforcement officer about his approaching

17  Mr. Stewart's vehicle?

18  A    He went to the passenger door, he entered the passenger

19  door, spent a very brief time inside there.  He exited, walked

20  directly back to his vehicle and drove away, never entered the

21  store, never met with anybody else, never spoke with anybody

22  else.  And all I saw him is drive westbound on 46th Street,

23  and we maintained surveillance on Mr. Stewart.

24  Q    Was he carrying anything?

25  A    Not that I could tell.

1  Q    And did you see what direction that individual headed off

2  to?

3  A    Westbound on 46th Street.

4  Q    Did you take any measures to take down the plate number

5  of that other individual and identify who he was?

6  A    We attempted to.  We were running very shorthanded due to

7  the volume of traffic during that time of the evening.  It was

8  very difficult to maintain that.  So no, we did not.  I would

9  have liked to obtain the license plate on that vehicle, but it

10 was just not feasible.

11 Q    And again, you couldn't see what was going on in the

12 vehicle; is that correct?

13 A    No, sir.

14 Q    There was nothing within the vehicle like an audio device

15 or anything that had been placed on the other individual or

16 anything along those lines, right?

17 A    No.

18 Q    It was just your supposition then that some kind of a

19 controlled transaction or some kind of a transaction was going

20 on in that vehicle; is that right?

21 A    I have been involved in a lot of drug investigations.  I

22 have observed drug investigations on the street level.  I have

23 done drug trafficking.  I have very substantial background as

24 a police officer and detective in narcotics investigations.

25 So my opinion, that appeared to me at that Shell Gas Station

1  to be a drug transaction, yes.

2  Q    Essentially it was a hunch, right, based on your

3  experience as a law enforcement officer?

4  A    I guess in my experience I believed it to be a drug

5  transaction.

6  Q    Then you participated in pursuing Mr. Stewart's vehicle?

7  A    Yes.

8  Q    And again, what was the route that you took?

9  A    Mr. Stewart exited the gas station.  He was followed

10  northbound on 65 where he continued northbound on I-465.  I

11  caught up to him probably a mile from the 86th Street exit as

12  we were traveling northbound where he exited onto 86th Street.

13  Q    And the 86th Street exit, in that vicinity basically

14  heads kind of uphill, doesn't it?

15  A    I think it is downhill, actually.

16  Q    Downhill?

17  A    Somewhat downhill.

18  Q    Mr. Stewart was heading northbound towards 86th Street;

19  is that right?

20  A    Yes.  He was in the far right lane, which would be the

21  lane to stop at a stoplight which both the eastbound turn lane

22  was red as well as the westbound turn lane to the off ramp.  I

23  pulled into the left of the lane which was the westbound turn

24  lane and stopped at the red light, continued to observe Mr.

25  Stewart, who rolled the stoplight and continued eastbound on

1   86th Street.

2   Q    Did you make a determination whether the Volkswagen that

3   Mr. Stewart was driving was a standard shift vehicle?

4   A    I couldn't tell.

5   Q    Are you aware of Volkswagens in general and vehicles with

6   clutches?

7   A    I am sorry.  I didn't hear that.

8   Q    Are you aware of Volkswagens that have standard

9   transmission -- that have standard transmissions and clutches?

10  A    I am aware of vehicles having clutches and stick shifts,

11  yes.

12  Q    Are you aware that they occasionally roll when the person

13  is trying to stop while waiting to make a right turn or

14  something like that if they are going downhill?

15  A    Yes.  It is certainly possible.

16  Q    Did you look at Mr. Stewart's taillights to ascertain

17  whether or not his brake lights were on?

18  A    Yes.

19  Q    Okay.  And were they on or not?

20  A    His brake lights were on as he approached the red light

21  and rolled through the stoplight without stopping, which I

22  believe he admitted to.

23  Q    If his brake lights were on, how could he not have

24  stopped?

25  A    When you put your foot on the brake, you don't instantly

1  stop.  Your vehicle slows down.  His vehicle did not come to a

2  complete stop.

3  Q    Was there heavy traffic on 86th Street at that particular

4  time?

5  A    No.

6  Q    It might have been he saw his opportunity to make a turn;

7  is that correct?

8  A    He apparently did.

9  Q    Now, who would have been responsible for administering a

10  citation to Mr. Stewart for not stopping?

11  A    I believe I had radioed to Detective Brady Ball to assist

12  in the investigation who made the traffic stop at 86th and

13  Zionsville Road.

14  Q    And Detective Ball is primarily a narcotics enforcement

15  detective; isn't that correct?

16  A    He is assigned to the IMPD Criminal Interdiction Unit.

17  Q    How come you didn't make the stop yourself?

18  A    I was in an unmarked vehicle, which is –– I was in a GMC

19  Envoy, and I was in plainclothes so I couldn't actually make a

20  stop.

21  Q    What is the distance between Zionsville Road where Mr.

22  Stewart was eventually stopped and the exit off of 86th Street

23  approximately?

24  A    Maybe three-quarters of a mile to a mile possibly.

25  Q    Okay.  Were you present, and did you observe Officer

1  Ball's actual stop of Mr. Stewart?

2  A    I turned –– when Mr. Stewart rolled the stoplight and

3  continued eastbound on 86th Street, I turned westbound and

4  then conducted a U-turn once I got underneath I-465.  Then I

5  followed behind, and I did see Detective Ball make the stop

6  and as I passed by when Mr. Stewart pulled into the Speedway

7  gas station.

8  Q    What side of the road was the stop on?  What direction

9  was Mr. Stewart headed by the time you made your U-turn and

10  came back?

11  A    That is like a three-part question.  Can you say that

12  again?

13  Q    Well, what side of the road did the stop occur on?

14  A    South side, south side.

15  Q    Would the vehicles have been facing westbound ––

16  eastbound?

17  A    He was driving eastbound, correct.

18  Q    And the vehicle was stopped off on the side or a berm of

19  some kind or another; is that correct?

20  A    Speedway parking lot.

21  Q    A parking lot; is that correct?

22  A    Gas station lot.

23  Q    And that was on private property; is that correct?

24  A    Private business I guess you would say.

25  Q    So the vehicle was not obstructing traffic in some way or

1   another, was it?

2   A    No, not on the public roadway.

3   Q    By the time you arrived and observed the white

4   Volkswagen, was Mr. Stewart out of the car?

5   A    Can you ask that again?  I don't understand.

6   Q    By the time you observed Mr. Stewart's vehicle stopped at

7   the Speedway gas station, was he out of the vehicle?

8   A    No.

9   Q    Was he still in the vehicle?

10  A    Yes.

11  Q    Did you participate in the process of administering a

12  traffic citation to him?

13  A    No.

14  Q    Did you approach the vehicle at the same time that

15  Officer Ball did?

16  A    No.

17  Q    Did you watch Officer Ball approach the vehicle for

18  purposes of administering a traffic citation?

19  A    No.

20  Q    What measures did you take at that point or did Officer

21  Ball take at that point that you visually observed?

22  A    When Detective Ball made the stop, I continued eastbound

23  on 86th Street.  I was approximately a half a block or so down

24  the street.  I pulled onto the south side of the street where

25  I could see the back end of Detective Ball's police car.  That

1   is where I was sitting.

2   Q    Approximately what distance away were you?

3   A    About a half a block.

4   Q    What were you parked in front of, some commercial entity

5   of some kind?

6   A    Some sort of business, yes.

7   Q    And were you in some way or another in communication with

8   Brady Ball at that point in time?

9   A    Yes.

10  Q    How were you communicating?

11  A    By radio.

12  Q    And what was the subject of your communication?

13  A    He had radioed that he had found a substantial amount of

14  narcotics and a firearm, and he called for my assistance.

15  That is -- I waited approximately five, ten minutes and then

16  showed up at the scene.

17  Q    Did you observe the procedure that he followed in order

18  to find the firearm and the substantial amount of narcotics?

19  A    No.

20  Q    So whatever you would know about that would have been

21  related to you by him in some way or another, memorandum or in

22  communication directly; is that right?

23  A    Yeah.  I couldn't see what was going on or what was said

24  at the traffic stop at the time.  I could just see the back

25  end of Detective Ball's police car.

1  Q    You were eventually asked to come and be of assistance?

2  A    Yes.

3  Q    What did you do?  Where did you position yourself to be

4  of assistance?

5  A    I pulled into the parking lot and pulled off to the side

6  out of the flow of traffic at the gas station.  I approached

7  Detective Ball.  He showed me the heroin and cocaine and the

8  crack and meth that was on the scale and the money that was

9  found in the trunk.  He then showed me the handgun that was

10  found next to the driver's seat, and then I spoke with Mr.

11  Stewart.

12  Q    At that point in time did Detective Ball communicate to

13  you the methodology he used to gain access to Mr. Stewart's

14  vehicle and conduct his search?

15  A    He had indicated that his dog had made a positive

16  indication on the vehicle, that -- I was aware of that.

17  Q    Did you observe the canine circling the vehicle?

18  A    No.

19  Q    Where was Mr. Stewart when you arrived by that point in

20  time?

21  A    I believe he was standing outside Detective Ball's police

22  car, I believe.

23  Q    And how much time would you say would have elapsed

24  between the time that you exited on West 86th Street and the

25  time that Mr. Ball communicated to you that you had searched

1  Mr. Stewart's vehicle?

2  A    Short amount of time, ten to 15 minutes.

3  Q    How long did you remain at the location where Mr. Stewart

4  was being detained and his vehicle had been searched?

5  A    It wasn't too long, ten to 15 minutes.

6  Q    During that time Mr. Stewart was outside of a vehicle; is

7  that correct?

8  A    No.  He had, he had said he was very cold, so I put him

9  in the passenger seat of my car.

10 Q    So during that period of time did you conduct an inquiry

11 with Mr. Stewart?

12 A    I basically explained to him, reminded him, asked him if

13 he had been read Miranda.  He said yes, and I reminded him of

14 his Miranda rights.  I explained to him that the officer had

15 found a large amount of narcotics in his car and a handgun and

16 a lot of money and a scale and that he had an option.  And the

17 option was to, you can tell the truth and cooperate or you can

18 go to jail.

19 Q    What did Mr. Stewart choose out of the options?

20 A    He chose to go to the police station and be interviewed.

21 Q    And during the course of that interview, was he

22 reMirandized or --

23 A    He was read his Miranda rights again off of an advice of

24 rights form.  He verbally stated he understood and signed the

25 document in my presence along with Detective Ryan Clark.

1  Q     And what subjects did you get into during the course of

2  your interview with him?

3  A     During the interview?  The interview was essentially

4  about the truth of his possession of the narcotics in his

5  vehicle, the firearm, the source, and trying to substantiate a

6  truthful interview, which I, in my opinion, it wasn't very

7  truthful, especially about his source in the beginning.

8  Q     Eventually, did he come forth with his actual source?

9  A     He did identify the source, yes.

10  Q     Did you obtain any other information from Mr. Stewart

11  during the course of the interview?

12  A     Nothing useful other than he identified one person.

13  Q     Were there any subsequent discussions with Mr. Stewart

14  after that particular interview?

15  A     No.

16  Q     Had he asked you for an attorney during that course of

17  time at all?

18  A     No.

19  Q     Had you talked with him about something called Boykin

20  rights?

21  A     Boykin?

22  Q     Are you familiar with that concept?

23  A     No.

24  Q     I mean, not Boykin, I am sorry -- Pirtle rights.

25  A     Boykin?  Pirtle?  I am aware of Pirtle.  He was in

1   custody.

2   Q      What is your understanding of Pirtle rights?

3   A      It is a noncustodial type of search.  You read people

4   their Miranda rights essentially.  A scaled-back version of

5   Miranda would be considered Pirtle in a noncustodial fashion.

6   Q      In this case you regard the circumstances as custodial;

7   is that correct?

8   A      He was definitely in custody.

9   Q      And you don't know prior to your arrival at the scene

10  whether there was other inquiry with him by Detective Ball

11  before he was in custody, do you?

12  A      You would have to ask Detective Ball that.

13  Q      Okay.  Who was the officer who was responsible for

14  obtaining a search warrant of the respective residences?

15  A      Detective Jeff Sequin wrote the search warrant.

16  Q      Are you aware that there was more than one search

17  warrant?

18  A      I was.

19  Q      Okay.  And for which locations were those search warrants

20  pertinent?

21  A      ████████████████████████████████████, and then

22  there was an address I believe on South Villa.

23  Q      And are you aware of any other locations?

24  A      No, sir.

25  Q      Did you eventually go to a residence that was occupied by

1  Mr. Stewart's significant other?

2  A    No.

3  Q    Okay.  Are you aware of any searches of that residence?

4  A    Yes.

5  Q    Okay.  And who would have participated in those searches?

6  A    Eagle Creek Parkway address?  That would be Detective

7  Ryan Clark, Detective Chris Duckworth.  I wasn't there.  I

8  just remember because those two are my unit, discussing the

9  evidence they had found there.  I was not there.

10  Q    Now, you say you have quite a bit of experience with this

11  type of law enforcement and drug cases; is that correct?

12  A    Yes, sir.

13  Q    Can you indicate your awareness of what a pretextual

14  search is and whatever its implications are?

15  A    Yes.

16  Q    Or pretextual stop I guess?

17  A    Pretextual stops?  Yes.  I am aware.

18  Q    Okay.  Well, what is a pretextual stop?

19  A    It is essentially knowing possibly somebody may be

20  violating the law or having knowledge thereof and then

21  directing somebody to effectuate an arrest, a --

22  Q    Now --

23  A    -- stop, or a detention, sorry.

24  Q    Okay.  Now, pretextual stop is a stop when you believe,

25  in essence, in a case like this, that somebody has been

1  distributing drugs; is that correct?

2  A    Yes.

3  Q    And you have indicated here today that in any of the

4  previous incidents, other than for the Shell station

5  observation, that you never saw any drugs being transacted;

6  isn't that correct?

7  A    No -- or that's correct, yes.  We had not observed Mr.

8  Stewart conduct any drug transactions prior to January 20th.

9  Q    So other than an ordinary traffic infraction, what

10 unlawful activity did you observe that would have made you

11 feel like the stop was a valid pretextual stop?

12 A    Other than what I believed to be a drug transaction at

13 the Shell?  Nothing.

14 Q    It was just your subjective belief then; is that correct?

15 A    Yes.

16          MR. EPSTEIN:  I have nothing further, Your Honor.

17          THE COURT:  Miss Brady, your witness.

18          MS. BRADY:  Thank you, Your Honor.

19                       **CROSS-EXAMINATION**

20 BY MS. BRADY:

21 Q    I know you have already, Detective, spoken a little bit

22 about your training and experience.  Just to put a little more

23 meat on those bones, approximately how many narcotics

24 investigations would you say you have been involved in since

25 you first began conducting narcotics investigations in the

1   year of 2004?

2   A    Well over a thousand.

3   Q    Were any of those investigations federal investigations?

4   A    Yes, ma'am.

5   Q    Approximately how many federal narcotics investigations

6   would you say you have been involved in over the years?

7   A    Oh, between 12 and 15.

8   Q    Some of those wiretap investigation?  So, in other words,

9   extensive federal investigations as well?

10  A    Primarily those cases were wiretap cases.

11  Q    Approximately how many times would you say you have

12  conducted surveillance regarding suspected drug trafficking

13  activity?

14  A    How many times?

15  Q    How many times roughly?

16  A    I will just say over a thousand.

17  Q    Have you had the opportunity in your more than a decade

18  of narcotics experience to interview drug traffickers?

19  A    Yes.

20  Q    And would those have been in, for example, proffer

21  sessions where an individual has been arrested and wants to

22  come forward and speak to the Government about his drug

23  trafficking activity?

24  A    Yes.

25  Q    Would that also have been in situations, for example,

1  prior to individuals being arrested where perhaps they want to

2  cooperate with the state or federal authorities and possibly

3  become informants?

4  A    Yes.

5  Q    Approximately how many individuals would you say you have

6  interviewed regarding their activities, their drug trafficking

7  activities?

8  A    Quite a few.  It is 100 or more.

9  Q    More than 100?

10     Have you ever heard, in speaking with these individuals,

11 that gas stations are a common area to conduct drug

12 transactions?

13 A    Yes.

14 Q    Have you learned why they would be preferred locations to

15 conduct drug transactions?

16 A    Well, the obvious reasons would be a lot of vehicle and

17 foot traffic, so it would be hard possibly for law enforcement

18 to detect maybe what sort of behaviors are not criminal and

19 would be considered criminal.  That would be the main one why

20 people would -- and also at gas stations people stay typically

21 short amounts of time.  So if you don't know what you are

22 looking for, you could possibly miss something.

23 Q    Now, backing up a little bit.  I believe you have already

24 testified Daniel Stewart was known to you as of January 20,

25 2015.  Is it correct that he was suspected of being a drug

1  customer of Geraldo Colon's?

2  A     That's correct.

3  Q     In fact, Geraldo Colon was indicted in this courthouse in

4  roughly April 2015 for drug trafficking offenses; is that

5  correct?

6  A     That's correct.

7  Q     Now, as of January 20, 2015, is it correct that you knew

8  Daniel Stewart was a felon numerous times over?

9  A     Yes.

10  Q     Okay.  Would that have had any significance when you

11  learned that there was a firearm in the front passenger

12  compartment in which Daniel Stewart was the driver and sole

13  occupant of?

14  A     Correct.

15  Q     What would that have indicated to you?

16  A     That he is in a lot of trouble.

17  Q     That was an unlawful possession of a firearm per se, due

18  to his being a convicted felon numerous times over?

19  A     Yes.

20  Q     Now, when you arrived at the site of the traffic stop

21  after Detective Ball had called you and said, hey, please come

22  directly to the location, I think you said you were about a

23  half a block away at that point?

24  A     Yes.

25  Q     Okay.

1     Now, were you aware upon arriving directly at the scene

2  of the car stop that Detective Ball had already informed the

3  Defendant of his Miranda rights?

4  A     Yes.

5  Q     Now, at some point you spoke with the Defendant there at

6  the location of the traffic stop, correct?

7  A     Yes.

8  Q     Where did you speak with the Defendant at that location

9  of the traffic stop?

10  A     In my car.

11  Q     Okay.  Where were you sitting?

12  A     In the driver's seat.

13  Q     Where was the Defendant?

14  A     In the passenger seat.

15  Q     So inside the vehicle?

16  A     Yes.

17  Q     Was anyone with you when you spoke with the Defendant at

18  the location of the traffic stop?

19  A     Yes.

20  Q     Who else?

21  A     Detective Sgt. Garth Schwomeyer.

22  Q     Where was he?

23  A     He was in the backseat.

24  Q     Okay.  Now, that would have been after Detective Ball had

25  already informed the Defendant of his Miranda rights?

1   A    Yes.

2   Q    Did you ever inform the Defendant of his Miranda rights

3   there at the site of the traffic stop?

4   A    Yes.

5   Q    Why?

6   A    I wasn't sure what he was going to say, being that he was

7   a suspected customer of Colon and also the amount of drugs

8   that was found in his car.  I just didn't know what he was

9   going to say, so I wanted to make sure he understood his

10  rights and that he didn't have to make a statement.

11  Q    What was the Defendant's response when you personally

12  informed the Defendant of his Miranda rights?

13  A    He stated he understood.

14  Q    Did the Defendant speak with you there at the site or the

15  location of the traffic stop?

16  A    Did who?

17  Q    Did the Defendant speak with you there at the location of

18  the traffic stop?

19  A    The defense?

20  Q    Defendant.

21  A    Oh, yes.  I thought you said defense.  Sorry.

22  Q    The Defendant.  What did you and the Defendant speak

23  about there at the site of the traffic location?

24  A    He -- I explained to him the situation that he was in and

25  what he was essentially looking at and that he was in a lot of

1  trouble.  And he did not really talk or make a statement

2  initially.  He attempted to, as aiding and –– his cooperation,

3  he wanted us to let him go and then meet us again at another

4  location a couple hours from then.  And I explained to him

5  that that wasn't going to happen.

6  Q    Did he ask you to just release him from your vehicle?

7  A    Yes.

8  Q    I am confused.  Why would you have done that?

9  A    That is what he was requesting.  That was his form of

10  cooperation.

11  Q    Now, when you indicated that wasn't going to happen, you

12  weren't going to let the Defendant out for a few hours to, and

13  then come back to you with ––

14  A    No.

15  Q    –– information or whatever he would come back to you

16  with, what happened next?

17  A    Detective Ryan Clark had showed up at the scene at this

18  time and spoke with Mr. Stewart at the passenger window and

19  essentially reiterated the same thing I said about you have

20  got a couple of different options here.  You can go to jail

21  right now, or you can come to the police station and make a

22  statement.

23  Q    Were you there to hear Detective Clark tell the Defendant

24  that?

25  A    Yes.

1  Q    And what happened next?

2  A    He said he would -- he wanted to be let go, but we told

3  him no, that is not going to happen.  You have these two

4  options, and he chose to go to the police station.

5  Q    So what did he do next?

6  A    We drove Mr. Stewart to IMPD northwest district and

7  placed him in an interview room, and Detective Ryan Clark read

8  him his advice of rights.  Mr. Stewart stated he understood.

9  Q    Let me back you up just a moment.  During the drive from

10 the site of the traffic stop to the police station, who was in

11 the vehicle during that drive?  Who was driving the car first?

12 A    I was driving, and Mr. Stewart was riding in the

13 passenger seat.

14 Q    Anybody else in the car with you?

15 A    No.

16 Q    Anybody following or trailing your vehicle to ensure it

17 made it to the police station?

18 A    Detective Ryan Clark was following in his vehicle.

19 Q    Did you speak with the Defendant during the drive?

20 A    Yes.

21 Q    What did you all speak about during the drive to the

22 police station?

23 A    He was a little bit uncomfortable because he is kind of a

24 bigger guy, and he had his hands handcuffed.  I suggested that

25 he turn his body kind of sideways and rest on one of his hips.

 1  He was also seat belted in, so to relieve, you know, the

 2  pressure on his wrists, so.

 3  Q    Did you speak to him about the facts of his arrest or the

 4  facts of the ongoing investigation during the drive to the

 5  police station?

 6  A    No.

 7  Q    Why not?

 8  A    Well, one, I had switched into this GMC Envoy that day or

 9  the day before, and I didn't have my equipment with me.  I

10  didn't have a recorder.  And also, there was no one else with

11  me.  So it was really no point in talking about the case at

12  all.

13  Q    So exactly what happened when you and the Defendant got

14  to the police station?

15  A    He was placed in an interview room and Mirandized again.

16  He signed the advice of rights form, being aware of his

17  rights.

18  Q    Let me, let me back you up.  Before the advice of rights

19  did you speak to the Defendant at all or interact with him as

20  you placed him there in the interview room?

21  A    Yes.

22  Q    What happened?

23  A    While we were at, just to kind of elaborate on this

24  conversation.  At the traffic stop I searched him for weapons

25  before I put him in the passenger seat, which is a standard

1  policy for IMPD, and it is a very smart thing to do because

2  Mr. Stewart was under arrest.  That for safety reasons I

3  searched him there, and when we got to the police station, I

4  also searched him again and removed everything from his person

5  and placed it on the table in the interview room.

6       I then —— we sat down, and there is actually a sign

7  posted in the room reminding that everybody is subject to

8  search inside this room for obvious reasons.

9  Q    You just discussed that sign and explained why you had

10  searched him again even though he had already been searched

11  prior to that?

12  A    Yes.

13  Q    Now I believe you indicated that Detective Clark informed

14  the Defendant what his Miranda rights were?

15  A    Yes.

16  Q    Let me back you up.  I believe you have already testified

17  that you were in plainclothes.  Was Detective Clark also in

18  plainclothes?

19  A    Yes.

20  Q    Were either of you visibly armed with a firearm?

21  A    No.

22  Q    Did you ever raise your voice to the Defendant?

23  A    No.

24  Q    You ever hear Detective Clark raise his voice to the

25  Defendant?

 1  A     No.

 2  Q     Who led the interview, you or Detective Clark?

 3  A     Detective Clark.

 4  Q     Now, I believe you indicated Detective Clark did inform

 5  the Defendant of his Miranda rights.  Was any document

 6  utilized to assist Detective Clark in informing the Defendant

 7  of his Miranda rights?

 8  A     Yes.

 9          MS. BRADY:  May I briefly approach the witness, Your

10  Honor?

11          THE COURT:  You may.

12  BY MS. BRADY:

13  Q     I am just showing you what has already been admitted for

14  purposes of this hearing as Government Exhibit 3.  Do you

15  recognize this one-page document that has Indianapolis Police

16  Department advice of rights at the top?

17  A     Yes.

18  Q     What is this document?

19  A     This is the document that the Defendant signed that

20  night.

21  Q     And it appears that there is a signature about

22  three-quarters of the way down on this document under the

23  waiver of rights that appears to be Daniel Stewart's

24  signature.  Did you see the Defendant sign this waiver of

25  rights?

1  A    Yes.

2  Q    Now there are two other signature blocks, one being the

3  witness block.  That is a somewhat less legible signature; is

4  that your signature there?

5  A    Yes.

6  Q    Okay.  After the Defendant -- I am sorry, after Detective

7  Clark read these Miranda rights to the Defendant, did he

8  indicate in your presence whether he understood his rights?

9  A    He did.

10  Q    What did he say, that he understood?

11  A    He stated he understood.

12  Q    Now at any point at all during the interview that then

13  followed, did the Defendant say he didn't want to talk to you?

14  A    No.

15  Q    Did he say he didn't want to talk to Detective Clark?

16  A    No.

17  Q    At any point did the Defendant ask you to stop talking to

18  him?

19  A    No.

20  Q    Did you ever hear the Defendant ask Detective Clark to

21  stop talking to him?

22  A    No.

23  Q    I would like to ask one substantive question -- actually,

24  a couple of questions about the substance of the interview.  I

25  believe you testified on direct that you did not find the

1   Defendant's post Miranda statement extremely forthcoming; is

2   that correct?

3   A     That's correct.

4   Q     Now you indicated that he did tell you who his source of

5   supply was.  Is it accurate that he never named his source of

6   supply as Geraldo Colon?  He never said those two words,

7   correct?

8   A     That's correct.

9   Q     Is it accurate that he gave you enough of a descriptor

10  based on all of the investigation that had already occurred,

11  you knew that is who he was talking about?

12  A     Yes.

13  Q     Okay.  But he declined to and was specifically asked for

14  the name of his source of supply and he claimed he didn't

15  know.

16  A     Correct.

17  Q     Approximately 28 minutes and 45 seconds into the

18  videotaped statement, did you and Detective Clark discuss with

19  the Defendant the drugs, specifically those drugs found in the

20  trunk of the vehicle of the Defendant's car?

21  A     Yes.

22  Q     What did the Defendant tell you about those drugs?

23  A     He didn't want to -- he was asked what kind of weight the

24  drugs were.  He didn't want to commit to any sort of weight;

25  however, he did say he has had those drugs for quite some

1  time.

2  Q    The drugs that were in the trunk of his vehicle, he said

3  he had had those for a long time?

4  A    Yes.

5  Q    Now finally, being an officer with IMPD, you are, is it

6  accurate, pretty familiar with the Indiana traffic code?

7  A    Yes.

8  Q    Are you familiar with any exemptions from the law

9  requiring one to stop at a red light if one is driving a

10 manual transmission vehicle?

11 A    There is no exception.

12 Q    Are you familiar with any exemptions under the law that

13 you can ignore a stoplight if one subjectively believes that

14 it is safe to proceed without stopping?

15 A    No.

16         MS. BRADY:  Thank you.  I have no further questions.

17         THE COURT:  Redirect, Mr. Epstein?

18              **REDIRECT EXAMINATION**

19 BY MR. EPSTEIN:

20 Q    In terms of Mr. Stewart's failure to stop, what speed was

21 he traveling at, or was it just a complete nonstop?

22 A    He slowed down but did not stop at the red light.

23 Q    What was the slowest speed he reached, or was it when he

24 reached the stop sign or the traffic signal?

25 A    I bet you he was probably going somewhere around 5 miles

1  an hour would be my guess.  I don't have a radar gun on him.

2  Q    A California stop?

3  A    I am not sure what that is.

4  Q    Like my teenage daughter used to do years ago, but thank

5  you.

6           THE COURT:  On those issues, Miss Brady?

7           MS. BRADY:  No.  Thank you.  I would note, Your

8  Honor, Detective Brady Ball is in the hallway, but I have no

9  further recross for this witness.

10          THE COURT:  You may step down.

11          THE WITNESS:  Thank you, Judge.

12                    (Witness excused.)

13          THE COURT:  Mr. Epstein, you may call your next

14  witness.

15          MR. EPSTEIN:  What is the name of the person in the

16  hallway?

17          MS. BRADY:  Ball.

18          MR. EPSTEIN:  I will call Detective Ball, Your

19  Honor.

20          THE COURT:  Very well.

21        **BRADY BALL, DEFENDANT'S WITNESS, SWORN**

22                **DIRECT EXAMINATION**

23          THE COURT:  Your witness, Mr. Epstein.

24          MR. EPSTEIN:  Thank you, Your Honor.

25

1  BY MR. EPSTEIN:

2  Q      Good morning.  Are you Detective Brady Ball?

3  A      Yes, sir, I am.

4  Q      Is that your actual rank, or am I misstating that?

5  A      My rank is patrolman.  My position is detective.

6  Q      And what do you assign to in terms of the Indianapolis

7  Police Department?

8  A      I am assigned to covert investigations, criminal

9  interdictions, the criminal interdiction section of IMPD.

10  Q      And through that assignment, what are your duties?

11  A      It is pretty wide ranging.  We are involved in drug

12  interdiction.  We are involved in interdiction on the

13  interstate system, interdiction at the motels and hotels.  I

14  am assigned to canine; along with eight other members of the

15  unit, we do canine requests.

16       We work on citizen complaints, reference drug dealing

17  mostly to do with larger scale drug dealing and groups that

18  involve themselves in drug dealing.  One of the bigger things

19  that we do is we assist narcotics units such as in this

20  investigation, what was referred to as the long-term,

21  long-term investigations unit all the way up from the FBI,

22  DEA, all the way down to district level narcotics.

23  Q      And how long were you involved in the investigation of

24  Daniel Stewart?

25  A      It involved another investigation, but my time with this

1   investigation was only, to my knowledge, when Detective

2   VanOeveren called me that day or requested me to hit in for

3   him on the radio channel we were using.

4   Q    And what hour was it or time approximately when Detective

5   VanOeveren called you?

6   A    I think it was a little bit before 6:00 p.m.  He knows --

7   or that unit knows that I am an evening shift officer, so he

8   knows I come on around 6:00 p.m.  And what they do is they

9   usually give me a call before then, so between 5:00 and

10  6:00 is when they contacted me.

11  Q    And where were you located at that point in time when you

12  received the call?

13  A    My home.

14  Q    And how was the communication done, by radio or

15  transmitter?

16  A    I think I got a text message from Detective VanOeveren,

17  and I believe he indicated the radio channel they were working

18  on.  Then I switched to that radio channel and communicated

19  with him I think that way.

20  Q    And without getting into the specifics of where your home

21  is, what would the distance be from there to the location

22  where you stopped Daniel Stewart?

23            MS. BRADY:  Objection, relevance.

24            THE COURT:  Overruled.  You may answer if you know.

25            THE WITNESS:  Roughly Southport and I-65 to the area

1 of 86 and 465 on the northwest side.  I don't know the actual

2 mileage, maybe 20, 25 minutes from -- that direction, from

3 that location.

4 BY MR. EPSTEIN:

5 Q    So absent a request for assistance by Detective

6 VanOeveren, you wouldn't have been following Daniel Stewart

7 that day; is that correct?

8 A    Later on but not until I actually -- not before that, no.

9 Q    And where was it that you first encountered Daniel

10 Stewart?

11 A    Him specifically was during the traffic stop.

12 Q    Okay.  What location would that have been at?

13 A    Zionsville Road and 86th Street, Speedway gas station

14 parking lot.

15 Q    Did you actually visually observe Mr. Stewart run a

16 traffic signal, pass a traffic signal?

17 A    Yes.  At the top of the -- it is the on ramp that goes

18 down to 86th Street, I believe it is.  Officer VanOeveren, I

19 believe, was controlling the radio traffic, and he radioed Mr.

20 Stewart's white Volkswagen.  It rolled through another stop

21 for the light, the red light.  At that time I could see him

22 and I think it was two other vehicles at the time.  I wasn't

23 sure it was the vehicle that just rolled through the red light

24 turning eastbound.

25 Q    Did you actually see him roll through the red light?

1  A    I saw what I believed was his car, yes; his Volkswagen,

2  yes.

3  Q    And where were you positioned in relation to the off

4  ramp?

5  A    I was coming down the off ramp off of I-465.

6  Q    You mean the southbound off ramp?

7  A    Northbound.

8  Q    How could you go down the northbound?  Is it a two-way

9  off ramp?

10  A    I don't understand the question.

11  Q    In other words, at 86th Street and I-65, is it a two-way

12  or two-direction off ramp?

13  A    No.  It is just I think three or four lanes to the best

14  of my recollection.

15  Q    How would you have been able to go down that?

16  A    I don't understand the question.

17  Q    In other words, if the off ramp allows someone to exit to

18  the north and it is only one direction; isn't that correct?

19  A    Yes.  That would be north, and then they would turn east.

20  Q    Unless I am misunderstanding your testimony, you couldn't

21  have gone south on that same off ramp.

22  A    No.

23  Q    Gotten on it; is that right?

24  A    No.  I had been following him at that point, and I got on

25  the ramp there.  They identified the vehicle to me as the

1  vehicle they wanted stopped, and about that same time Officer

2  VanOeveren gave out the radio traffic that, describing the

3  vehicle and that he had ran, rolled through the red light is

4  about the same time that I was coming down the ramp that goes

5  down towards 86th Street.

6  Q    I see.  You were traveling eastbound on 86th Street; is

7  that correct?

8  A    No.  I never testified to that.

9  Q    You were traveling southbound on I --

10  A    Be northbound on the ramp on I-465.

11  Q    Okay.  Behind --

12  A    86th Street.

13  Q    Behind Mr. Stewart?

14  A    No.  I was never behind him until I stopped him.

15  Q    So at what point did you first visually observe Mr.

16  Stewart?  Where was his vehicle positioned?

17  A    He was one of many cars in line to turn onto 86th Street,

18  turning right, which would be eastbound onto 86th Street.

19  Q    Every one of those cars stopped?

20  A    No.

21  Q    So --

22  A    Not every one of them stopped, no.

23  Q    So in essence, your whole purpose for stopping Mr.

24  Stewart was the suspicion that he was involved in drug

25  dealing; is that correct?

1  A    The way it works is I have what another law enforcement

2  officer told me about the activity of Mr. Stewart, and then

3  what I ask for from them is for another law enforcement

4  officer to observe the infraction, which he radioed he did.

5  And I told him, I asked him what car it was.  He identified

6  the car, so at that time we also had a traffic infraction.

7  Q    And the only reason you would have stopped him was

8  because you were a uniformed officer; is that correct?

9  A    I was the officer that they called.  I don't know -- I

10 can give you that answer.  I was the officer they called.

11 This is the kind of things that I do, and they requested me to

12 do it so I did the traffic stop, yes.

13 Q    And the traffic stop was by a particular filling station;

14 is that correct?

15 A    Yes, sir.  It was at a Speedway gas station is where he

16 pulled into.

17 Q    What were the lighting conditions like by the time you

18 stopped Mr. Stewart?

19 A    Well, that street is actually pretty well lit.  It is a

20 well traveled area, so it has streetlights.  The gas station

21 is a standard, if you can imagine a standard Speedway gas

22 station.  They are pretty responsible having their parking

23 lots well lit.  I would say the lighting was not like

24 sunlight but much better than anyplace else he could have

25 pulled over.

1  Q    And you had him pull over on the gas station itself; is

2  that correct?

3  A    No.  I turned on my lights long before that.  He traveled

4  for a good distance before he pulled over and decided to pull

5  in.  He chose to pull into the Speedway gas station.

6  Q    Was there a volume of traffic in the direction he was

7  heading?

8  A    There was traffic.  I would call it moderate.

9  Q    So he evidently chose to pull out of traffic; is that

10 correct?

11 A    I don't know what he was thinking, sir.

12 Q    He was out of traffic; is that right?

13 A    That is correct.

14 Q    And he was not obstructing traffic by the time he pulled

15 over; is that correct?

16 A    Well, he asked for the gas station parking lot.

17 Q    Was he blocking the exit or the entrance to the gas

18 station?

19 A    Yes.  We were in front of where the, I guess it would be

20 the west exit on the 86th Street side.  In terms of traffic

21 on -- I guess it was Zionsville Road and 86th Street.

22 Q    86th Street, was he obstructing any traffic there?

23 A    Not on 86th Street, no.

24 Q    You approached his vehicle?

25 A    Correct.

1  Q    On which side of the vehicle did you approach on?

2  A    I usually approach on the passenger side, and that is

3  what I did in this case.

4  Q    The vehicle had tinted windows?

5  A    Yes.  They were lightly tinted, correct.

6  Q    And did you approach the vehicle and flash a light into

7  the vehicle of some kind or another, or how did you gain Mr.

8  Stewart's attention?

9  A    I believe I knocked on the passenger side window.

10  Q    And with respect to Mr. Stewart, did you indicate to him

11  the reason for which he was being stopped?

12  A    Yes.  I told him there was -- he had ran through the --

13  didn't stop for the red light at the 86th Street exit off of

14  465.

15  Q    And did you ask him for any identification such as his

16  driver's license or registration?

17  A    Yes.

18  Q    Was he cooperative in that regard?

19  A    There was a little bit of a delay.  It seemed like he was

20  nervous in talking to me in fumbling about for, like he was

21  looking for his license.  There was a higher degree of

22  nervousness than what I usually see.  I think I spoke to him

23  about that, possibly about the license.  Then he provided me

24  that information.

25  Q    He wasn't agitated or uncooperative, was he?

1   A    No.  I wouldn't describe him as either of those.

2   Q    Now, did you take his information and go back to your

3   vehicle to do the usual type of an identification that

4   officers do?

5   A    Knowing what I knew at the time based on the other

6   officers, Detective VanOeveren's information about a possible

7   drug transaction that had taken place, I wanted to put him in

8   a position where I could see his hands, and for my safety I

9   asked him to step out of the vehicle and I believe to the back

10  of his vehicle.  And at that point in time, I think I did.  I

11  may have it out of sequence.  I think I had a conversation

12  with him about his criminal history and consent to search the

13  vehicle.

14  Q    So this was not about a traffic stop at this point; is

15  that correct?

16  A    Yes.  I was asking the routine questions that I ask

17  during a traffic stop.  I always ask those questions, so at

18  that point there was more to it that I knew of, but I was

19  conducting a traffic stop.

20  Q    What questions specifically did you ask him?

21  A    I don't remember at that time.  I know consent was one of

22  them.

23  Q    Did you handcuff him when he was out of the vehicle?

24  A    No, not at all.  He wasn't handcuffed at that time.

25  Q    Did you ask him for consent to search the vehicle?

1  A    I did.

2  Q    And what was his response?

3  A    It was no, but it was a little bit more than that.  But

4  it was just no, he didn't want me to search the vehicle or

5  words to that effect.

6  Q    How is he dressed when he was outside of the vehicle?

7  A    To the best of my recollection, he was wearing pants and

8  a sweatshirt, maybe sweat pants and tennis shoes.  I know they

9  were like pants or slacks, and I know it was a, a thicker

10  shirt than a T-shirt.  But specifically, I don't recall.

11  Q    What were the temperatures like on January 20th of 2015

12  that evening approximately?

13  A    Well, it was fluctuating but it was cooler out.

14  Q    Excuse me?

15  A    It was cooler out.  I don't know the temperature that

16  date, but it was just fall-type weather, near winter, close to

17  winter-type weather.

18  Q    How were you dressed on that occasion?

19  A    This exact type uniform except I had long sleeves on.

20  Q    Did there come a point in time when you placed handcuffs

21  on Mr. Stewart before Detective VanOeveren arrived?

22  A    Yeah.  There was a time several, several minutes later.

23  Q    Can you estimate how many minutes it would have been

24  before you finally placed him in handcuffs?

25  A    I mean, I -- the sequence of events was calling for

1  backup, doing the computer checks, beginning the ticket,

2  having the other officer take over the ticket and then running

3  the dog.  I would say -- I am just kind of guessing here,

4  roughly ten to maybe 12, 13 minutes, somewhere in there, I

5  think.

6  Q    That was before you put him in handcuffs; is that

7  correct?

8  A    Yeah.

9  Q    And then when you put him in handcuffs, where did you

10  position Mr. Stewart?

11  A    There was a backup officer there.  I don't recall his

12  name.  They had Mr. Stewart sit on the curb, which was about

13  ten or 15 feet away from our vehicles with that officer

14  standing by him.

15  Q    Do you know who the backup officer was?

16  A    I am sorry?

17  Q    You know the identity of the backup officer?

18  A    I do not.  There was, there was a district patrolman who

19  was a training officer, and he had his recruit with him, which

20  we, we refer to as a training officer.  I, I just don't

21  recall.  There may have been a run history, but I don't recall

22  their names.  I am not too familiar with them.

23  Q    So they were standing watch or vigilance over Mr. Stewart

24  while you took additional measures; is that correct?

25  A    No.  He, there was -- probable cause had been gained at

1  that point, and there was some pretty serious allegations by

2  another police officer as far as drug dealing.  There was

3  officer safety at that point based on what had occurred with

4  the canine.  So he was detained and just being watched by

5  those officers or that officer.

6  Q    How long was he detained while you were gaining entry to

7  the vehicle and conducting your search of the vehicle?

8  A    After the canine indication for the odor of narcotics, I

9  went to him and I handcuffed him, explained to him I think the

10 canine alert.  And then I went to the vehicle and searched the

11 vehicle locating a handgun between the driver's seat and

12 passenger seat.  That was really quick, so within three to

13 four minutes I think of handcuffing him is when I went and did

14 all that.

15 Q    That is in addition to the 13 minutes or so that you were

16 talking about before?

17 A    He was never handcuffed during that time.  I don't

18 understand the question.

19 Q    I am talking in essence, basically, overall how long was

20 he outside and waiting at the scene while you conducted your

21 search of the vehicle?

22 A    Just so I am clear, when he got out of the vehicle to the

23 point that he got into another vehicle, or I don't -- I am

24 just not clear on the question.

25 Q    To the point that he got into the other vehicle would be

1  good.

2  A    I really would be guessing on that, but I would say, wow,

3  probably 20 to 25 minutes, somewhere in there.  We would

4  actually have to time it out off the audio recording to really

5  know the exact time.

6  Q    And in terms of him being placed in the other vehicle,

7  what circumstances led to your finally placing him in the

8  other vehicle?

9  A    Okay.  Well, I had ran the police dog, the canine.  She

10  is trained to alert on the presence of the odor of illegal

11  narcotics.  Her and I are both a certified and trained canine

12  team.  I ran my dog around the vehicle.  She indicated to the

13  driver's side door, positive alert to the odor.  Upon that

14  happening is when we just discussed the four-minute

15  conversation and the search.

16      I opened the door, searched the vehicle, located the

17  handgun.  From that, there was me Mirandizing Mr. Stewart and

18  confronting him about the gun, and then after that I continued

19  to search and went to the trunk and located a large amount of

20  narcotics to include cocaine, powder cocaine, methamphetamine,

21  and currency.

22      And then there was further conversation about that to the

23  point that I told him that my policies and procedures required

24  me to contact a narcotics detective to have him speak to them

25  or them to speak to him.  And within maybe a few minutes of me

1 radioing a narcotics detective, which was actually Detective

2 VanOeveren, they arrived on scene and they took him to their

3 vehicle, and at that point it became whatever their

4 investigation entailed.

5 Q    Would it be fair to say that it was approximately 34

6 minutes and ten seconds by the time all of that occurred?

7 A    Yeah.  That would be, I mean, if we could time it out,

8 sure.  That is pretty close.

9 Q    What would your stated probable cause have been to

10 conduct the warrantless search?

11 A    I, I absolutely don't understand what you said.

12 Q    In other words, you said there was –– by that time there

13 was probable cause at a certain point in my questioning of

14 you.  What was that probable cause?

15 A    Canine alert.

16 Q    Hum?

17 A    The canine alert.

18 Q    Okay.  With respect to the canine alert, in the course of

19 34 minutes and ten seconds was it impossible to have an

20 officer bring a warrant to the location?

21 A    It is a possibility, but the way I am trained under what

22 I understand to be the automobile exception with the canine

23 alert, that opens up the vehicle to the search based on the

24 probable cause of the canine's alert.  And that is how I

25 proceed outside of a detective or someone else instructing me

1  that they want to get a warrant, get a warrant.  That is how I

2  commonly operate.  If the dog indicates, I believe I have

3  probable cause, and I act then and there on the probable

4  cause.

5  Q    In your training with respect to the automobile exception

6  to the search warrant requirement, is that supposed to embrace

7  what are called exigent or emergency circumstances?

8          MS. BRADY:  Objection, Your Honor.

9          THE COURT:  Sustained.

10 BY MR. EPSTEIN:

11 Q    In other words, what is your understanding then of the

12 automobile exception and how it is applicable and when?

13         MS. BRADY:  Objection, relevance.

14         MR. EPSTEIN:  It is relevant to determine whether

15 the automobile exception is actually applicable here.

16         THE COURT:  I think you are getting in more of a

17 legal analysis.  He can say what he did and such as that and

18 why he did it.  I think you are getting kind of beyond that

19 into an analysis that this witness hasn't otherwise been

20 qualified to present.

21         MR. EPSTEIN:  Okay.  That is reasonable, Your Honor.

22 BY MR. EPSTEIN:

23 Q    Did you take any other measures after Josie indicated

24 positive on the vehicle?

25 A    Could you please help me understand what you mean by

1  measures.

2  Q    What did you do after Josie indicated positive on Mr.

3  Stewart's vehicle?

4  A    Sure.  The standard operating procedure upon that is to

5  basically praise the dog.  That is the reward system, and then

6  the dog is then put back into the kennel.  And I think I

7  stated, as I stated before, we went to Mr. Stewart -- or I

8  went to Mr. Stewart, explained to him the canine alerted,

9  explained to him that was probable cause.  At that time he was

10  placed into handcuffs and then sat on the curb next to the

11  other officers, and then I immediately began the search of the

12  vehicle.

13  Q    Where did Josie indicate positive on the vehicle?

14  A    I am sorry?

15  Q    Where did Josie indicate that there was contraband on the

16  vehicle?  At what location on the vehicle?

17  A    It was the driver's side door around the area of the door

18  handle.

19  Q    Where was contraband ultimately found?

20  A    The contraband involved in this case was a handgun inside

21  the car, the passenger compartment, and then several grams and

22  ounces of cocaine and methamphetamine, along with currency,

23  located in the -- there is a compartment in the back of this

24  type of vehicle, a Volkswagen.  It drops down.  It was inside

25  that compartment, which is a factory compartment for the car.

1  Q    The trunk area or some compartment within the --

2  A    Trunk area, same side of the vehicle where she indicated.

3  Q    Okay.  In terms of Josie's training, does Josie have any

4  training to detect firearms?

5  A    No.

6  Q    In terms of where the drugs and the money were located,

7  it was in the rear compartment of the vehicle; is that

8  correct?

9  A    The trunk.

10 Q    Trunk.  How many feet away or inches away would that have

11 been from where Josie indicated positive?

12 A    This is a guess but maybe three and a half feet I guess.

13 I am guessing.

14 Q    Was there any drug residue located during the course of

15 your search within the passenger compartment of the vehicle?

16 A    Did I locate any drug residue?  No.

17 Q    Did any of the other officers, to your knowledge, locate

18 any drug residue inside the passenger compartment?

19 A    Josie did, but that -- Josie is only trained to alert on

20 the part -- scent particles, which would indicate particles

21 related to narcotics are present.  That is what the dog is

22 pretty much after.  So yes, there would be some kind of

23 residue to cause that reaction that remains in the area that

24 she indicated.  As far as recovered, no.

25 Q    Okay.  But did Josie actually indicate, or did you

1   recover or anyone else recover any drug residue inside the

2   passenger compartment of the vehicle?

3   A    No, not that I am aware of.

4   Q    All you know is that Josie was generally indicating that

5   something was wrong there; is that correct?

6   A    No.  That would be an incorrect statement.  The way the

7   dogs are -- that would just be an incorrect statement, but I

8   can answer that if you would like me to.

9          MR. EPSTEIN:  I have nothing further Your Honor.

10         THE COURT:  Thank you.

11     Miss Brady?

12         MS. BRADY:  Thank you, Your Honor.

13                        **CROSS-EXAMINATION**

14   BY MS. BRADY:

15   Q    Detective, what would be a correct statement regarding

16   the question you just received?

17   A    Sure.  The way the dogs are trained and certified or we

18   are certified as a team is that the dog is trained to detect

19   and alert to the scent particles or odor of cocaine,

20   marijuana, methamphetamine, or heroin.  So saying a general

21   area could be close to true, but she only indicates where she

22   believes the source is.  And if that is the strongest area

23   where she believes odor is, that is where she is going to

24   indicate.  And in this case she specifically indicated on the

25   driver's side door around the driver's door handle.

1  Q    Well, wouldn't that indicate to you, Detective, that your

2  dog falsely alerted if there was no drugs there and the drugs

3  were only found in the trunk?

4  A    No.  The way, the way we explain that or way to help

5  people understand that that don't understand the way the dog

6  works is the popcorn theory.  If you were to pop popcorn and

7  then eat all that popcorn and then, you know, defense counsel

8  were to walk in the room, he would still smell that odor of

9  popcorn.  Those scent particles still remain, but the popcorn

10 is eaten and gone, thrown away.  You have to understand that

11 the dog is only interested in those scent particles, that odor

12 that remains.

13      So drugs could have been just dropped off, drugs could

14 have just been sold, drugs could have just been eaten.  The

15 actual drugs themselves are gone, but the actual odor that

16 remains is all the dog is interested in.  And that is what the

17 dog indicates to show the change of behavior in and then

18 finally alerts to.

19 Q    Prior to your testimony, the United States admitted into

20 evidence a declaration.  Do you recall signing said

21 declaration yesterday?

22 A    I did.

23 Q    Does that remain true and correct to the best of your

24 knowledge at this point?

25 A    Yes.

1  Q    Just to clarify too for the record, how does Josie alert?

2  How do you -- what is the change of behavior that you see as

3  her partner that would lead you to believe that Josie has

4  detected the odor of narcotics?

5  A    Again, we are certified each year through, as a team.  I

6  have to certify in recognizing my dog's change of behavior

7  towards the odor of narcotics, but I also -- the dog is also

8  trained to change behavior and then go to a positive alert

9  based on the odor of narcotics.  So she has to do her job, and

10 I have to observe that.  And I also have to do my job by

11 observing that.

12      And basically you will see, for example, in this case the

13 dog goes around the vehicle and scans.  That is her -- that is

14 just the way she does it.  And then she will do a second

15 go-around, and then there will be more detail.

16      In this case there was a head flick is what we call it,

17 which she caught an odor.  That, I know, is her change of

18 behavior towards an odor that is one of the four odors that

19 she is trained on.  At that point she goes into what is called

20 the scent cone.  You just have to imagine a cone where the

21 scent particles are dropping in a specific place where she is

22 catching that odor.

23      That area may be presented or may not be presented.  I

24 presented that area to her, which is just an indication.  Zook

25 is the command, and at that point she entered completely into

1 | the scent cone and went to a sit position telling me that she

2 | is on, what she believes is the source for the drugs.

3 | The final -- the change of behavior for us is an

4 | indication.  That tells us if there are drugs present.  What

5 | we train the dog for -- what I need to see is for her to sit.

6 | In this case, she sat.

7 | Q    You indicated that you had just come on shift.  Is it

8 | possible that the dog was just tired and was taking a break?

9 | A    No.  This dog really does have superior performance.  She

10 | is nonstop 100 percent of the time.  She knows she is at work

11 | when she gets into that vehicle, and she is ready to work.

12 | And she had not done anything that day.  She was ready to go.

13 | MS. BRADY:  No further questions.  Thank you.

14 | THE COURT:  Anything further, Mr. Epstein?

15 | MR. EPSTEIN:  Just a few, Your Honor.

16 | **REDIRECT EXAMINATION**

17 | BY MR. EPSTEIN:

18 | Q    To your knowledge, has Josie ever falsely alerted?

19 | A    As far as falsely alerted?  No.

20 | Q    Mistakenly alerted?

21 | A    No.  I don't know of any instances where she has

22 | mistakenly alerted.

23 | Q    You were about to say something else.  Have there been

24 | incidents where Josie indicated that there was something there

25 | and there was nothing there?

1  A    I, I am sorry, I didn't understand the question.

2  Q    Were there instances where Josie indicated, you know,

3  that there was something there or alerted and there proved to

4  be no contraband?

5  A    I have already answered that.  The dog only knows odor.

6  In human terms, we don't know the same odor she knows.  So we

7  could open up the car door and the car be void of any drugs.

8  You have to understand, she is only interested in that odor.

9  For us, there is nothing there.  But for her, there is

10 absolutely odor there, and that is all she is concerned with.

11 So yes, the answer is yes.  She has indicated, and we have

12 opened up the vehicle and either not found the drugs or the

13 drugs were so hidden so well that we couldn't find them.

14 Q    Now you have indicated that the weather conditions that

15 night were cool; is that correct?

16 A    Yeah.  It was cool out.

17 Q    Was there any wind?

18 A    I don't remember, but I don't think so.

19 Q    Was Mr. Stewart's vehicle a clean vehicle, well

20 maintained in the interior?

21 A    To the best of my recollection it was in good shape,

22 yeah.  I -- yeah.

23 Q    No rummage was strewn around the vehicle or anything like

24 that?

25 A    I mean --

1  Q     You know, like garbage or things discarded?

2  A     No.  I mean, he didn't have like wrappers, food wrappers.

3  The only thing that I can recall is maybe a gym bag and

4  obviously things in the center console and the handgun with

5  the drugs.  Those are the only things that I can recall.

6  Q     Now, with respect to the firearm, you know, found in the

7  vehicle, was it tested in some way or another that he either

8  ascertained the presence of residue from drugs or to ascertain

9  whether or not Mr. Stewart's fingerprints were on it?

10  A     I am not in a position to answer that question.  You

11  would have to ask one of the detectives involved in that.

12  Q     With respect to what was found inside the trunk of the

13  vehicle in terms of drugs and contraband, how were they

14  packaged?

15  A     I believe it was a Crown Royal bag or a bag like a Crown

16  Royal bag.  You had very large chunks that appeared to be off

17  of bricks of drugs, and then you had powder.  And then you

18  had -- they were all packaged in like plastic, plastic bags,

19  large plastic bags.

20  Q     And there was no seepage that you could determine from

21  looking at it, was there?

22  A     Well, I knew one for sure was cocaine.  It was a pretty

23  big sizable amount of cocaine.  The other, I believe, was

24  heroin, and I think it ended up being methamphetamine.  But it

25  looked like heroin to me, and the other end would be a powder

1  cocaine.  The money, I knew what the money was right away.

2  Q     But nothing leaking from the bags, you know, like residue

3  of cocaine or heroin or any of the substances found; is that

4  right?

5  A     Well, yeah.  I mean, there was, I mean, it appeared that

6  in my opinion, they were easily accessible.  So they weren't

7  cleaned, and they weren't well kept.  There was, you know,

8  consistent with having a large amount of drugs inside a bag,

9  there was some, you know, remnants.  Obviously they had been

10  opened at some point, but as far as spillage like you are

11  talking about, I mean, no, it wasn't spilled all over the

12  place.

13              MR. EPSTEIN:  I have nothing further, Your Honor.

14              THE COURT:  Thank you.  On those issues, Ms. Brady?

15              MS. BRADY:  No.  Thank you, Your Honor.

16              THE COURT:  You may step down.

17              THE WITNESS:  Thank you, Your Honor.

18                      (Witness excused.)

19              THE COURT:  Further witnesses, Mr. Epstein?

20              MR. EPSTEIN:  No further witnesses, Your Honor.

21              THE COURT:  Very well.  You rest?

22              MR. EPSTEIN:  Yes, Your Honor.

23              THE COURT:  Rebuttal, Ms. Brady?

24              MS. BRADY:  No.  Thank you.  Your Honor, for the

25  record, may Detective Ball be released?

1          THE COURT:  He can be excused.

2          THE WITNESS:  Thank you.

3          THE COURT:  All right.  Will there be argument, Mr.

4    Epstein?

5          MR. EPSTEIN:  Your Honor, rather than do an oral

6    argument, I would prefer to submit a supplemental memorandum

7    within a short period of time.  Would that be okay?

8          THE COURT:  Three days?

9          MR. EPSTEIN:  Sounds good, Your Honor.

10          THE COURT:  Get them in.  We will, in lieu of final

11    argument then, ask for post hearing submissions simultaneously

12    filed by 5:00 o'clock on Friday, the 9th?

13          MR. EPSTEIN:  Thank you, Judge.

14          THE COURT:  All right.  Anything further that we can

15    do today, Ms. Brady, in regards to the Government?

16          MS. BRADY:  No.  Thank you, Your Honor.

17          THE COURT:  From the Defendant, Mr. Epstein?

18          MR. EPSTEIN:  No.  Thank you, Your Honor.

19          THE COURT:  Very well.  Mr. Stewart will otherwise

20    be remanded to the United States Marshal pending further

21    proceedings.

22       (Concluded at 12:25 o'clock p.m.)

23                        - - -

24

25

1                CERTIFICATE OF COURT REPORTER

2

3          I, Jean A. Knepley, hereby certify that the

4     foregoing is a true and correct copy of the

5     transcript originally filed with the Clerk of Court

6     on February 25, 2016, at Docket No. 84, and

7     incorporating redactions of personal identifiers

8     determined by Josh J. Minkler, United States Attorney

9     for the Southern District of Indiana and Peter A.

10    Blackett, Assistant United States Attorney, pursuant

11    to Rule 49.1 of the Federal Rules of Criminal

12    Procedure and Southern District of Indiana Rule 80-2.

13    Redacted characters appear as a black box in the

14    transcript.

15

16

17    /S/ Jean A. Knepley                  March 2, 2016
      JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR   Date
18    Official Court Reporter
      Southern District of Indiana
19    Indianapolis Division

20

21

22

23

24

25