# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

November 5, 2018

To:

Laura A. Briggs
UNITED STATES DISTRICT COURT
Southern District of Indiana
United States Courthouse
Indianapolis , IN 46204-0000

|  | UNITED STATES OF AMERICA, Plaintiff - Appellee |
|---|---|
| No. 16-4105 | v. |
|  | DANIEL STEWART, Defendant - Appellant |

**Originating Case Information:**

District Court No: 1:15-cr-00024-WTL-DKL-1
Southern District of Indiana, Indianapolis Division
District Judge William T. Lawrence

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:     No record to be returned

This notice sent to:

[]      United States Marshal          [X]      United States Probation Officer

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                          **Received by:**

_____                    _____
         11/5/2018                                    Deputy Clerk, U.S. District Court

form name: **c7_Mandate**(form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**CERTIFIED COPY**

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

## FINAL JUDGMENT

September 5, 2018

Before:

FRANK H. EASTERBROOK, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

J. PHIL GILBERT, *District Court Judge**

| | |
|---|---|
| No. 16-4105 | UNITED STATES OF AMERICA,<br>Plaintiff - Appellee<br><br>v.<br><br>DANIEL STEWART,<br>Defendant - Appellant |

| **Originating Case Information:** |
|---|
| District Court No: 1:15-cr-00024-WTL-DKL-1<br>Southern District of Indiana, Indianapolis Division<br>District Judge William T. Lawrence |

The judgment of the District Court is **AFFIRMED**, in accordance with the decision of this court entered on this date.

\* Of the Southern District of Illinois, sitting by designation.

form name: **c7_FinalJudgment**(form ID: **132**)

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-4105

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL STEWART,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cr-00024-WTL-DKL-1 — **William T. Lawrence**, *Judge.*

ARGUED MARCH 30, 2018 — DECIDED SEPTEMBER 5, 2018

Before EASTERBROOK and ROVNER, *Circuit Judges*, and
GILBERT, *District Judge.*[*]

ROVNER, *Circuit Judge.* Daniel Stewart was convicted of
drug trafficking, firearms offenses, and money laundering,
primarily based on evidence gathered as a result of a traffic

---

[*] Of the Southern District of Illinois, sitting by designation.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

stop and a subsequent confession. We affirm the district court's denial of Stewart's motion to suppress the traffic stop evidence and the confession, and we reject Stewart's additional claims on appeal.

## I.

On January 20, 2015, Detectives Jeff Sequin and Ryan VanOeveren were surveilling the home of Daniel Stewart. Stewart w as not the main focus of their investigation. For months, Indianapolis police had been trying to gather evidence about a large-scale cocaine supplier ultimately identified as Geraldo Colon. In May 2014, with the assistance of the federal Drug Enforcement Agency, they arrested three Arizona-based couriers who were bringing drugs into Indianapolis. One of those couriers, Juan Lizarraga, began cooperating with the investigators and provided information that led the officers to a major customer of Colon. Lizarraga did not know the customer by name but he knew the apartment complex where the customer lived, and he had seen Colon deliver drugs to the customer at that apartment complex and also at Colon's furniture store. Lizarraga offered the officers a general physical description of the customer.

Over a period of several months, officers surveilled Colon's furniture store. During that time, they twice observed Stewart visit the store, once on October 23, 2014, and once on December 16, 2014. On each occasion, Stewart stayed only a short time and made no purchase. Through further investigation, the officers identified Stewart and learned that he lived in the apartment complex pointed out by Lizarraga. Stewart had a criminal record that included felony drug offenses. In early

No. 16-4105                                                              3

January 2015, believing that Stewart was the customer identi-
fied by Lizarraga, they began to surveil Stewart in an attempt
to connect him to Colon's drug trafficking.

   In the early evening of January 20, 2015, Detectives
VanOeveren and Sequin followed Stewart's white Volkswagen
from his apartment complex to a Shell gas station. After
Stewart pulled up to a pump, another man exited a grey car
that was parked at the station, and walked over to the passen-
ger side of Stewart's car. The man got into Stewart's car and
closed the door. A few minutes later, the man exited Stewart's
car and immediately left the station in the grey car. Stewart
then got out of his Volkswagen and pumped gas. Although
they could not see through Stewart's tinted windows from
their vantage point some eighty yards away, based on their
many years of experience investigating drug crimes,
VanOeveren and Sequin believed that they had just witnessed
a drug sale at the gas station.

   They decided to watch Stewart's car for traffic violations
and to attempt a traffic stop. Because they were in plain clothes
and unmarked cars, they called Detective Brady Ball to the
scene in his squad car. Detective Ball specialized in drug
interdiction stops, and he traveled with Josie, a dog who had
been trained to detect the scent of illegal drugs. Detective Ball
testified that he arrived in the area in time to see Stewart fail to
stop at a red light when he made a right turn, the same
violation observed by the other detectives.[1] Detective Ball

_____

[1] The district court found that some ambiguity existed in the record as to
whether Ball himself saw Stewart fail to stop or whether he effected the
(continued...)

4                                                    No. 16-4105

activated his lights and Stewart pulled over in the parking lot
of a Speedway gas station.

Detective Ball recorded the audio of his encounter with
Stewart and so the trial court had a detailed, time-indexed
account of everything that was said during the stop.[2] At the
suppression hearing, Detective Ball supplemented this record-
ing with his personal observations and recollection. Detective
Ball explained to Stewart the reason for the stop and asked for
routine information such as license and registration. Stewart
seemed unusually nervous, fidgeting with his wallet and
taking several deep breaths as he complied with Ball's re-
quests. Because the car was registered to a business named
"Eleete Image, Inc." and because Stewart's address was
different from that on the registration, Ball asked for clarifica-
tion. Ball also asked questions related to officer safety such as
whether Stewart had any guns or knives in the car or on his
person. Stewart denied having any weapons. Ball asked
Stewart to exit the car and sit on the bumper. He noted that
Stewart's tinted windows were "borderline" illegal and asked

---

[1] (...continued)
stop on the basis of VanOeveren's report that Stewart failed to stop. Under
the collective knowledge doctrine, Ball was entitled to stop Stewart based
on the traffic violation witnessed and reported by VanOeveren. *See United
States v. Contreras*, 820 F.3d 255, 268 (7th Cir. 2016) (under the collective
knowledge doctrine, the court may attribute facts known to one officer to
other officers).

[2] The audio recording was submitted to the district court as an exhibit at
the suppression hearing without a separate record number. Stewart
supplied it to this court as a compact disc attached to his supplemental
appendix.

if Stewart had ever been arrested. Stewart responded that he had been arrested on drug charges "a long time ago." Ball asked for consent to search the car and Stewart declined. Ball noticed a bulge in Stewart's pocket and asked him what it was. Stewart replied that it was $700 in cash. Ball then returned to his squad car to run the license and registration information as well as a check for outstanding warrants. Seconds later, Ball was back out of his car, again asking Stewart to sit on the bumper. Five minutes had elapsed at this point in the stop.

Moments after returning to the squad car, Ball radioed a request for backup. He explained that he was on an interdiction stop and wanted to run his dog around the car. He requested that officers arrive as quickly as possible. It appears from the audio recording that Ball continued to work on the traffic violation as he waited for a response to his request for backup, but an estimate of the time attributed to calling for backup would be at most seventy-five seconds.[3]

As he waited for backup to arrive, Detective Ball continued the process of checking the license and registration, running a

---

[3]   All references to the audio recording will be given in the format minutes:seconds elapsed from the beginning of Detective Ball's encounter with Stewart. Ball's call for backup began at 5:11. From 5:23 to 6:01, the recording consists of occasional electronic beeps, undecipherable radio transmissions and periods of silence. From 6:01 to 6:09, from 6:50 to 7:04, and from 7:16 to 7:19, Ball supplied additional information about his location and his need for backup. In the midst of waiting for a reply on his request, at 6:25, Ball can be heard beginning to run a check on the car's registration under the name, "Eleete." We estimate that the time spent calling for backup, excluding audio content clearly related to the traffic mission of the stop, is at most seventy-five seconds.

check for outstanding warrants, and beginning to write the ticket. Approximately thirteen minutes into the stop, while Detective Ball was still completing tasks related to writing the ticket, the backup officers arrived. For approximately forty-five seconds, Detective Ball spoke to the backup officers, explaining to one officer how to complete the electronic ticket-writing process (which was apparently new), and asking the other officer to keep a watch over Stewart. Ball then removed Josie from his car and walked her around Stewart's car. On her second pass around the Volkswagen, Josie alerted to the driver's side door. The entire process of Josie exiting the squad car, sniffing, and then alerting took one minute and forty-five seconds. The backup officer was still working on the ticket when Josie alerted. Detective Ball offered further advice on completing the ticket, and then approached Stewart.

He explained to Stewart that Josie had alerted to the odor of illegal drugs, and he handcuffed Stewart, clarifying that he was not under arrest. Detective Ball explained at the suppression hearing that he felt this was necessary for officer safety based on the description of the suspected gas station drug transaction, Josie's alert, and the background information that he had learned about Stewart prior to making the stop. Believing he now had probable cause to search the car, he began to inspect the interior of Stewart's Volkswagen. *See Florida v. Harris*, 568 U.S. 237, 246–47 (2013) (certification of a dog by a bona fide organization after testing the dog's reliability in a controlled setting or successful completion of a recent training program that evaluated the dog's proficiency in locating drugs creates a rebuttable presumption that the dog's alert provides probable cause to search). Almost immediately,

No. 16-4105                                                    7

Detective Ball found a handgun in the center console area, within reach of the driver's seat. Knowing that Stewart was a convicted felon, he now had probable cause for an arrest. *See* 18 U.S.C. § 922(g)(1). He placed Stewart under arrest and gave him *Miranda* warnings. He then continued his search of the car. Although he found no drugs in the passenger compartment of the car, he found a bag in the trunk containing approximately 102 grams of crack cocaine, 250 grams of powder cocaine, 241 grams of heroin, 19 grams of methamphetamine, and a digital scale. He also found $7,420 in cash. The purported $700 in Stewart's pocket turned out to be $1,904, for a total of $9,324 in cash.

Detective Ball approached Stewart again and said, "That's a lot of drugs, bud. You want to talk to a detective?" Stewart appeared to shake his head to indicate "no." Ball clarified, "You do not want to talk to a detective? Well, you understand I gotta have one come out." Stewart replied, "Can you put me in the car? It's kind of cold out."[4] Ball said, "Yes, they're going to talk to you regardless so you'll get in the car at that point. I have a dog in my car." Ball then radioed for narcotics officers to come to the scene. We will discuss that call and the subsequent interchange between Ball and Stewart more completely below when we address Stewart's motion to suppress his confession. Eventually Stewart was placed in the car of the narcotics officers when they arrived on the scene.

---

[4] Temperatures hovered between thirty-eight and forty-one degrees on this January day, and Stewart was wearing pants, a sweatshirt and tennis shoes.

VanOeveren and Sequin were the officers who arrived to transport Stewart. VanOeveren reminded Stewart of his *Miranda* rights and asked if Stewart wanted to talk about the gun, narcotics and cash found in his car. Stewart first tried to talk the detectives into releasing him for a short period, promising to meet them later to assist them in their investigation. The officers declined and gave Stewart two options: come with the detectives to the police station to discuss his situation or go straight to the Marion County Jail. Stewart opted to go to the police station with the detectives. Once there, officers brought Stewart into an interview room and Detective Ryan Clark gave Stewart his *Miranda* rights. Stewart indicated that he understood his rights and he signed a written waiver of those rights. He then made incriminating statements that were video-recorded. In the meantime, officers obtained a search warrant for his residence. The affidavit supporting the warrant detailed the cash, drugs and gun found in the car. The search of Stewart's home yielded an additional 1650 grams of cocaine; 1005 grams of methamphetamine; 1500 grams of heroin; four more handguns; and $487,542 in cash.

Stewart was charged in a six-count indictment with possession with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841 and 851; possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957; and two counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1). The district court denied Stewart's motion to suppress the evidence obtained during and

No. 16-4105                                                    9

as a result of the traffic stop and the confession he gave at the police station. The district court also denied Stewart's pre-trial motion *in limine* to prevent or limit the use of evidence that he had twice visited Colon's furniture store. After a four-day trial that included testimony about Colon's criminal activities, a jury convicted Stewart on all counts. Because Stewart had two qualifying prior felony drug convictions, his sentence on the drug possession count was life imprisonment without parole. *See* 21 U.S.C. § 841(b). For four of the remaining counts, the court sentenced Stewart to terms of imprisonment between five and fifteen years' imprisonment to be served concurrent with the life sentence. The sentence for possession of a gun in furtherance of a drug trafficking crime tacked on a gratuitous five consecutive years to the sentence of life imprisonment. Stewart appeals.

## II.

On appeal, Stewart contends that the evidence gained through the traffic stop should have been suppressed because Detective Ball unconstitutionally prolonged the stop in order to conduct the dog sniff procedure. Stewart also asserts that the prolonged detention due to the sniff was not otherwise supported by reasonable suspicion. Any evidence obtained after the search of his car, he argues, should be suppressed as the fruit of the poisonous tree. Stewart maintains that the incriminating statements he made following his arrest should also have been suppressed because investigators violated his invocation of his right to remain silent. He also submits that the district court erred in admitting substantial amounts of prejudicial and irrelevant evidence of prior bad acts. And finally, he asserts that the government failed to present

sufficient evidence in support of the money laundering convictions, rendering them infirm as a matter of law. He seeks to have the convictions on every count vacated and the case remanded for further proceedings. But he also contends that his convictions for money laundering should be reversed outright. Because some of these objections were preserved and others were not, we will address the standard of review as we turn to each issue.

### A.

Josie conducted her life-altering sniff of Stewart's car on January 20, 2015. The next day, the Supreme Court heard argument in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). The Court decided *Rodriguez* on April 21, 2015, some three months before Stewart filed his motion to suppress and five and a half months before the district court held the suppression hearing. In *Rodriguez*, the Supreme Court considered "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff." 135 S. Ct. at 1614. The Court concluded that a traffic stop may become unlawful if it is prolonged beyond the time reasonably necessary to complete the traffic-related mission of the stop. 135 S. Ct. at 1614–15. Unrelated inquiries may not measurably prolong a traffic stop, although an officer may conduct ordinary inquiries incident to the stop such as questions involving the driver's license, the vehicle's registration, and whether there are outstanding warrants for the driver. 135 S. Ct. at 1615. These activities are all related to the mission and objective of enforcing the traffic code, and "ensuring that vehicles on the road are operated safely and responsibly." 135 S. Ct. at 1615. Because traffic stops are "especially fraught with

No. 16-4105                                             11

danger to police officers," an officer may also take "certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 135 S. Ct. at 1616 (citing *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). Dog sniffs, the Court said, may not be fairly characterized as part of the officer's traffic mission, and so dog sniffs may not prolong or add time to the stop unless supported separately by individualized, reasonable suspicion. *Rodriguez*, 135 S. Ct. at 1616–17.

On appeal, Stewart first argues that Detective Ball unreasonably lengthened the stop in order to conduct the dog sniff. Such a delay was unconstitutional under *Rodriguez*, he continues, and no reasonable suspicion supported lengthening the stop in order to conduct the sniff. Moreover, Stewart contends that the government failed to argue below that the evidence obtained from the stop was admissible under any exception to the exclusionary rule, and so the government forfeited any such claim on appeal. *See United States v. Leo*, 792 F.3d 742, 748–49 (7th Cir. 2015). In considering a district court's denial of a motion to suppress, we usually review findings of fact for clear error and questions of law *de novo*. *United States v. Borostowski*, 775 F.3d 851, 863 (7th Cir. 2014). However, the government asserts that Stewart did not preserve the issue that he raises on appeal because he failed to make a timely and specific objection in the district court. Because Stewart forfeited the issue, the government argues, we should review the district court's decision for plain error only. *See United States v. Olano*, 507 U.S. 725, 731 (1993); *United States v. Hamad*, 809 F.3d 898, 904 (7th Cir. 2016); Fed. Rule Crim. P. 52(b). The government also contends that this court should consider its claim that Detective Ball conducted the dog sniff in good faith reliance on

then-binding circuit precedent. *United States v. Leon*, 468 U.S. 897, 909 (1984) (unlawfully obtained evidence should not be suppressed when the police act on an objectively good-faith belief that their conduct is lawful); *Davis v. United States*, 564 U.S. 229, 241 (2011) (when binding appellate precedent specifically authorizes a particular police practice, the exclusionary rule should not apply if that precedent is later overruled by the Supreme Court); *United States v. Jenkins*, 850 F.3d 912, 918 (7th Cir. 2017) (same). Stewart responds that he adequately preserved the argument by raising it in a letter to the court after the suppression hearing, and that, in any case, the district court addressed the issue on the merits and did not treat it as forfeited. *See* R. 69 (Supplemental Authority In Support of Defendant's Motion to Suppress). By Stewart's measure, this court should therefore apply the usual standard of review and the government should be precluded from raising an exception to the exclusionary rule.

In his Motion to Suppress Evidence, Stewart challenged only whether Josie's sniff of the car provided probable cause to conduct a search. Specifically, Stewart complained that (1) Josie is not a reliable dog; (2) Josie was subjected to handler error; and (3) the drugs were planted in his car by police officers after Josie performed the sniff. R. 33 and 33-1. At the suppression hearing, Stewart made no mention of a claim that extra time was taken to conduct the sniff. After the suppression hearing, Stewart filed a supplemental memorandum where he contended for the first time that Ball was not entitled to conduct

No. 16-4105                                          13

the sniff at all.[5] Stewart argued that VanOeveren's testimony
that he had observed Stewart engage in a drug sale at the Shell
station was unreliable and not entitled to any weight in
determining probable cause or reasonable suspicion to conduct
the sniff. Stewart also argued in his supplemental memoran-
dum that the sniff could not be justified by his apparent
nervousness, and that Josie was unreliable because there was
testimony that she had alerted in the past on occasions when
drugs were not found. Stewart thus made no claims about the
sniff improperly lengthening the stop before, during or after
the suppression hearing. His only reference to *Rodriguez* came
after he filed a post-hearing supplemental memo, where he
submitted a copy of *Rodriguez* to the district court as supple-
mental authority. The letter accompanying the copy of the
*Rodriguez* decision read, in its entirety:

> Enclosed please find a case entitled Rodriguez v.
> United States, No. 13-9972. Argued January 21, 2015-
> Decided April 21, 2015 in the Supreme Court of the
> United States.
>
> Please give consideration to this decision in review-
> ing Mr. Stewart's Motion to Suppress Evidence.

R. 69.

   In denying the Motion to Suppress, the district court
rejected any argument that Josie was unreliable or that handler
error contributed to her alert, claims which Stewart has now

---

[5] By order of the district court, the parties were allowed to file supplemen-
tal memoranda simultaneously, three days after the suppression hearing.
R. 87, at 84.

abandoned on appeal.[6] The court also briefly addressed what it characterized as Stewart's challenge to the reasonableness of the length of time he was detained for the traffic stop. Citing *Rodriguez*, the court noted that police officers may not extend an otherwise-completed traffic stop, absent reasonable suspicion, in order to conduct a dog sniff. After a brief discussion of governing law, the district court concluded that Ball did not unconstitutionally prolong the stop:

> Approximately fifteen minutes elapsed between the time Ball pulled Stewart over and Josie's alert. … During that fifteen-minute period, Ball was actively engaged in conducting the traffic stop. When other officers arrived, Ball directed one officer to continue writing the ticket while Ball had Josie conduct an open air sniff. Thus, Ball did not prolong or extend the traffic stop beyond the time necessary to effectuate its purpose. Once Josie alerted, the encounter moved beyond that of a mere traffic stop, as probable cause to search the vehicle was established.

R. 70, at 6 (footnotes omitted).

Stewart is correct, in a sense, that the district court addressed the merits of the issue of whether the sniff prolonged the stop. The court, as we have just seen, found that Detective Ball did not, as a matter of fact, prolong the stop beyond the

---

[6]  The district court also noted that Stewart presented no evidence or argument in support of his claim that police officers planted drugs in his trunk after the sniff was completed. The court found no reason to give the claim any credence and rejected it. That claim has also been abandoned on appeal.

No. 16-4105                                                    15

time necessary to effectuate the traffic purpose of the stop
when he conducted the sniff procedure with Josie. On appeal,
Stewart now challenges this fact-finding by parsing the time
line of the stop. He faults Ball for taking the time to call for
backup, complains about the forty-five second delay in
explaining the electronic ticket process to the backup officer,
and objects to the actual time taken to run Josie around the car.
According to Stewart, the only conclusion is that "[t]he
resulting stop was longer than if Ball had simply written
Stewart a traffic citation," rendering the stop unconstitutional
under *Rodriguez*. Opening Brief, at 8.

Although Stewart has correctly identified the key question
under *Rodriguez*, prior to the appeal, Stewart never raised an
objection that would have alerted the government to the need
to make a record on this very point. In seeking to use evidence
obtained without a warrant, the government bore the burden
of proving by a preponderance of the evidence at the suppres-
sion hearing that an exception to the warrant requirement
applied. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir.
2000). At that hearing, the government presented evidence
relevant to Stewart's stated objections. That is, the government
provided evidence that Josie is a well-trained and reliable dog
with a proven track record of detecting the odor of illegal
drugs. The government also presented evidence that Detective
Ball was a highly trained handler and that no handler error
was involved in this search. Finally, the government presented
evidence that Detective Ball found the drugs in the trunk
during the search, negating the contention that the drugs were
planted in the truck after the fact.

The government had no reason to ask Detective Ball why he took the time to call for backup, and so the record is silent on whether he summoned backup both for officer safety and in order to conduct the sniff. He testified that safety was on his mind when he asked backup officers to watch Stewart after Josie alerted because he knew from his fellow officers that there were "some pretty serious allegations" of drug dealing by Stewart. Because Stewart failed to object specifically to the time taken for calling for backup, the court had no occasion to rule on whether the seventy-five seconds[7] used for that task should be attributed to the dog sniff or to some other proper purpose of the traffic stop such as officer safety. From the record that was developed, the government (had it been alerted to this objection) could have made a non-trivial argument that the call for backup was related as much to officer safety as to conducting the dog sniff. Detective Ball knew he was being asked to stop a felon suspected of selling drugs moments earlier. As the stop properly progressed, Ball saw that Stewart was unusually nervous, and learned that the bulge in Stewart's pocket was a notably large amount of currency, lending credence to the charge of recent drug dealing. Ball had to twice direct Stewart to sit on the bumper

---

[7] As we noted above, seventy-five seconds is the maximum amount of time taken to call for backup and respond to questions regarding the need for backup. That includes periods of near-silence. Because Stewart failed to alert the government and the court that he challenged this period of time, the record is undeveloped on what Ball was doing during that quiet period. For at least part of the gaps, he was audibly engaged in tasks related to the traffic violation. The district court, of course, found that Ball was actively engaged in conducting the traffic stop throughout the challenged period.

No. 16-4105                                                    17

of his car while Ball worked on the ticket. And as soon as the two backup officers arrived, Ball asked one officer to watch Stewart, which would seem to indicate that he was concerned for his safety even before conducting the sniff. But the government had no opportunity to present evidence or argument on this point because Stewart failed to timely and specifically object to this part of the time line.

Nor did Stewart alert the court or the government to his ultimate claim that "[t]he resulting stop was longer than if Ball had simply written Stewart a traffic citation," the salient question under *Rodriguez*. And so the government had no reason or opportunity to ask Detective Ball if he could have finished writing the ticket himself in less time than it took to conduct the sniff. Again, by listening to the time-indexed audio, we know that Detective Ball took approximately forty-five seconds to hand off the ticket to the backup officer (who was not fully familiar with the new electronic system), and roughly ninety seconds to run Josie around the car. The officer working on the ticket was not finished writing it when Josie alerted. That suggests that some additional amount of time was needed for any officer to complete the ticket. We are left with more questions than answers. Was the backup officer diligently working on the ticket while Detective Ball ran the dog around the car? Could Detective Ball have completed the ticket in less time than it took to call for backup, hand off the ticket and run the dog? Was any of that time attributable to tasks permissibly related to the mission of the traffic stop? And if so, could

Detective Ball have completed the ticket more quickly than the time attributed solely to the dog sniff?[8]

The reason we have no answers to these questions is that Stewart failed to raise this specific objection in a timely manner, when the government could have developed the record and the court could have ruled on the issue with full knowledge of the circumstances. From the moment the stop began to the moment Josie alerted, fewer than sixteen minutes had elapsed, not an unreasonable amount of time in the abstract for a ticket for running a red light. We know from the audio recording that the vast majority of that time was spent diligently completing tasks related solely to the mission of the stop. Any uncertainty about the remaining few minutes can be attributed only to the defendant's failure to raise this objection in a timely manner. *Rodriguez* had been on the books for months, and so the defendant had every opportunity to raise the issue before the suppression hearing. We will therefore treat the issue as forfeited and review for plain error.

In order to reverse for plain error, we must find (1) error (2) that is plain, and (3) that affects the defendant's substantial rights. *Olano*, 507 U.S. at 732; *Hamad*, 809 F.3d at 904. An error is plain if it is clear or obvious. *Olano*, 507 U.S. at 734; *Hamad*, 809 F.3d at 904. And an error affects the defendant's substantial

---

[8] By analyzing Stewart's claim in this fashion, we do not mean to imply that certain tasks will automatically count against the length of the mission of a traffic stop so as to prohibit a dog sniff in future cases. We simply cannot tell on this record how to allocate these tasks because the defendant failed to timely and specifically object. We leave that analysis for another day where the parsing of the time line matters to the outcome.

rights when it is prejudicial, that is, when it has affected the outcome of the district court proceedings. *Olano*, 507 U.S. at 734. Finally, "Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Olano*, 507 U.S. at 732 (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).

To state the standard is to demonstrate that Stewart cannot meet it here. He challenges the district court's factual finding that the sniff did not lengthen the stop. The court determined that Ball was actively engaged in conducting the traffic stop before handing off the ticket, and that another officer continued that mission while Ball ran Josie around the Volkswagen. In other words, the sniff was conducted contemporaneously with the traffic mission of the stop. Based on the evidence that the district court had before it, there is no reason to conclude that this finding was in error. Nothing in the record calls the court's finding into question, and to the extent that we simply do not know whether every moment was spent in traffic-related tasks, the fault for those omissions lies with Stewart.

The district court did not address whether any lengthening of the stop to conduct the dog sniff was otherwise supported by reasonable suspicion or probable cause. *See* R. 70, at 9 n.10 (declining to decide whether Ball independently had probable cause to search). Because we have concluded that there was no plain error in the court's finding that the stop was not unconstitutionally lengthened, we need not address whether Detective Ball possessed reasonable suspicion that would have allowed lengthening the stop in any case. Nonetheless, for the

sake of completeness we note that, at the time Detective Ball decided to conduct the sniff, he knew that Stewart was a felon and a drug trafficker who was being investigated for additional trafficking and an association with Colon. He knew that, moments earlier, his fellow officers witnessed Stewart engaged in an encounter that, in their extensive experience, they believed to be a drug sale. He knew that Stewart was unusually nervous when stopped for running a red light. And he knew that Stewart admitted to having $700 in cash in his pocket. It would be difficult to say that this information would not supply reasonable suspicion to support a delay of a few minutes to conduct a dog sniff. In short, the court did not err, much less plainly err, when it denied Stewart's motion to suppress the evidence found in the Volkswagen.

Stewart also contends that all evidence obtained as a result of the traffic stop should have been excluded as the fruit of the poisonous tree. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (the exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree). Obviously, if the original search was not unlawful, there is no basis to exclude evidence derived from the original search. The contraband found in the car formed the basis of a request for a warrant to search Stewart's home. Because there is no basis to exclude the evidence found in the car, there is no basis to exclude the evidence found in the home. Stewart also asserts that his confession was obtained as a result of the unlawful search of the car. Again, because there is no reason to exclude

the evidence found in the car, that search cannot provide a foundation for excluding Stewart's confession.

**B.**

We turn to Stewart's contention that the court erred when it refused to suppress his confession on the separate ground that it was obtained when the officers ignored his invocation of his right to remain silent and continued to question him. Stewart preserved this argument and so we review findings of fact for clear error and questions of law *de novo*. *United States v. Wysinger*, 683 F.3d 784, 793 (7th Cir. 2012). The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." Police officers must warn suspects prior to questioning that they have a right to remain silent, and if the suspect indicates that he wishes to remain silent, the interrogation must cease. *Maryland v. Shatzer*, 559 U.S. 98, 103–04 (2010); *Miranda v. Arizona*, 384 U.S. 436, 444–45, 473–74 (1966). A person who wishes to invoke his or her right to remain silent must do so unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010). "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Berghuis*, 560 U.S. at 382 (quoting *Davis v. United States*, 512 U.S. 452, 458–59 (1994)).

Stewart asserts that he unambiguously invoked his right to remain silent by shaking his head "no" in response to a question from Detective Ball regarding whether he wanted to talk to a detective. The district court found that "Stewart never affirmatively and unequivocally invoked his right to remain

silent." R. 70, at 10. The court noted that Stewart appeared to shake his head, and that when Ball twice tried to clarify the meaning of that gesture, Stewart responded by twice asking to be placed in a car because it was cold outside.

> Such responses were not an unambiguous invoca-
> tion of Stewart's right to remain silent such that
> officers were precluded from further questioning
> him. Stewart did not tell Ball that he no longer
> wished to answer Ball's questions. Nor did he
> explicitly state that he did not want to speak with
> detectives. As such, Stewart's argument on this
> ground must fail.

R. 70, at 10.

We begin with the context of that incident. *Wysinger*, 683 F.3d at 793–94 (in determining whether a suspect clearly invoked his or her right to counsel, we consider the circumstances in which the statement was made as well as the words employed); *United States v. Hampton*, 675 F.3d 720, 727 (7th Cir. 2012) (objective inquiry into whether suspect invoked right to counsel includes review of not only the words the suspect used but also the circumstances in which the statement was made). *See also Berghuis*, 560 U.S. at 381–82 (the standards which apply in determining whether a person has unambiguously invoked the right to counsel also apply in determining whether a person has invoked the right to remain silent). As soon as Detective Ball found a gun in the Volkswagen, he placed Stewart under arrest and read him his *Miranda* rights. He then began asking Stewart about the gun. Stewart freely answered these questions, telling Ball that his "girl" left the gun in the

No. 16-4105                                                    23

car, denying that his fingerprints or DNA would be found on the gun, and then changing his story to indicate that he had fired it at a gun range and that his prints might be on it. Detective Ball then searched the rest of the car and found the bag in the trunk that contained drugs and cash. Ball approached Stewart again and said, "That's a lot of drugs, bud. You want to talk to a detective?" Stewart appeared to shake his head to indicate "no." Ball clarified, "You do not want to talk to a detective? Well, you understand I gotta have one come out." Stewart replied, "Can you put me in the car? It's kind of cold out." Ball said, "Yes, they're going to talk to you regardless so you'll get in the car at that point. I have a dog in my car." After this, Ball called for narcotics officers to come to the scene. In the course of that call, Ball said over the radio:

> He's going to need to talk to a narcotics detective at some point. I don't know if he's going to talk but maybe if we sit him in a car and explain the seriousness of it, he'll talk to somebody but I've explained to him that, regardless, when we find the stuff, we have to have a detective. … I don't mean to waste your time but he doesn't seem like he wants to talk out in the open. Maybe if we sit him in a car, he'll want to talk. He originally said he didn't. He's been *Mirandized* and everything. But you know our protocols on the street. We have to call for a detective regardless.

Supplemental Appendix, audio disc at 28:25–29:26.

Detective Ball then returned to Stewart and said, "A detective is going to talk to you. If you want to talk to him, it's

up to you. I have a protocol to follow. You understand that? I wear this uniform. I may have a drug dog. I can do all this stuff but we have to follow our procedures, okay?" Stewart responded, "Can I sit in somebody's car? It's cold out here." Ball again told him that he had a dog in his squad car. The narcotics detectives then arrived and Stewart was placed in their car. Those officers delivered *Miranda* warnings again, and Stewart freely spoke to them as he tried to convince them to release him. He gave a video-recorded statement after being taken to the police station where he was given his *Miranda* warnings yet again and then signed a written waiver before making the video-recorded statement.

Stewart relies on the head nod as the unambiguous invocation of his right to remain silent. He argues that it is clear from the audio recording that Detective Ball understood that nod to mean that he did not wish to speak to the officer. Stewart contends that Ball was not asking for clarification when he said, after the head nod, "You do not want to talk to a detective." To Stewart, there is a period on the end of that sentence. The government contends that it is a question mark. The district court found that it was a question, a request for clarification. After listening to the recording, we can find no clear error in that conclusion. Detective Ball also indicated to other officers that he was not sure if Stewart would talk, that he appeared not to want to talk out in the open but that he might be willing to speak with officers if they sat him in a car. In context, none of Detective Ball's ensuing comments convince us that the district court clearly erred.

But in any case, Detective Ball's subjective beliefs do not govern the outcome here. The inquiry into whether a person

No. 16-4105                                                    25

has actually invoked the right to remain silent is an objective one. *Davis*, 512 U.S. at 458–59; *Wysinger*, 683 F.3d at 793. When a person "appears" to nod in the negative and then refuses to clarify the meaning of that gesture, there is no clear error in concluding that the nod was not an unambiguous invocation of the right to remain silent. This is especially true in the circumstances here. Stewart freely spoke to Ball after *Miranda* warnings and before the head nod. He refused to clarify the meaning of the nod and asked to sit in a car because of the cold. An ambiguous or equivocal reference that causes a reasonable officer to understand only that the suspect "*might* be invoking the right*" to remain silent is not enough to require the cessation of questioning. *Davis*, 512 U.S. at 459. A reasonable officer would have understood Stewart's apparent nod to mean that he might be invoking his right to remain silent, and such an officer would not be required to cease questioning if the suspect refused to clarify.

## C.

Stewart also contends that his convictions for money laundering must be reversed because the evidence was insufficient as a matter of law. "Ordinarily, we review a challenge to the sufficiency of the evidence to determine only whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, viewing the evidence in the light most favorable to the government." *United States v. Webster*, 775 F.3d 897, 904–05 (7th Cir. 2015). But Stewart failed to raise this objection in the district court and so

we review this forfeited claim only for plain error.[9] Fed. R. Civ.
Proc. 52(b); *Olano*, 507 U.S. at 731; *Webster*, 775 F.3d at 905;
*United States v. Esterman*, 324 F.3d 565, 569–70 (7th Cir. 2003).

Counts V and VI of the indictment charged Stewart with
laundering of monetary instruments in violation of 18 U.S.C.
§ 1956(a)(1)(B)(i).[10] Count V specifically charged that, on July
29, 2014, Stewart deposited $2,040 in currency into an Eleete
Image, Inc. account at Chase Bank; that this money was the
proceeds of ongoing narcotics trafficking; that he made the
deposit knowing that the transaction was designed in whole or
in part to "conceal and disguise the nature, location, source,
ownership, and control of the proceeds" of that unlawful

---

[9]   At oral argument, defense counsel confirmed that Stewart had no
objection to the jury instructions, and so any claim regarding the jury
instructions has been waived. *United States v. Locke*, 759 F.3d 760, 763 (7th
Cir. 2014) (when a defendant intentionally relinquishes or abandons a
known right, the issue has been waived and cannot be reviewed on appeal,
not even for plain error); *United States v. Aslan*, 644 F.3d 526, 540 (7th Cir.
2011) (where a defendant seeks to overturn a verdict for insufficiency of the
evidence but did not challenge his conviction for money laundering in the
district court and did not object to the jury instructions on this count, we
review the conviction for plain error).

[10]   That statute provides, in relevant part, "Whoever, knowing that the
property involved in a financial transaction represents the proceeds of some
form of unlawful activity, conducts or attempts to conduct such a financial
transaction which in fact involves the proceeds of specified unlawful
activity … knowing that the transaction is designed in whole or in part …
to conceal or disguise the nature, the location, the source, the ownership, or
the control of the proceeds of specified unlawful activity … shall be
sentenced to a fine … or imprisonment … or both." 18 U.S.C.
§ 1956(a)(1)(B)(i).

activity; and that while conducting and attempting to conduct this transaction, Stewart knew that the property involved represented the proceeds of ongoing controlled substances trafficking activity.[11] Count VI charged the same conduct, changing only the date and the amount of the deposit: on August 4, 2014, Stewart deposited $2350 into the Eleete Image bank account.

We previously mentioned Eleete Image, Inc. only once. The car that Stewart was driving when he was arrested was registered to that company and the license plates bore the name "Eleete." In order to address the sufficiency of the evidence claim on the money laundering counts, some background on Eleete is necessary. The evidence at trial demonstrated that, in 2012, Stewart hired Rosemarie Brown to incorporate a business for him in the name "Eleete Image, Inc." Brown filed the necessary paperwork with the state to create the corporation and also applied for an Employer Identification Number with the Internal Revenue Service. She listed Stewart as the business owner in the corporate documents but substituted her own address for the business address on the incorpo-

---

[11] Although Stewart pointedly did not challenge the jury instructions here, it is helpful to note that the jury was instructed, consistent with the language of the indictment and with the Seventh Circuit pattern instructions, that the government must prove beyond a reasonable doubt that "[t]he Defendant knew that the transaction was designed in whole or in part to conceal and [sic] disguise the nature, the location, the source, the ownership, or the control of the proceeds of ongoing drug trafficking activity. … The term 'conceal or disguise' means to hide the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." R. 137.

ration papers. She also created a website for Eleete, and testified that Stewart told her that he intended to run a number of businesses under the "Eleete" name including a food truck and a cleaning service, among other things. Stewart opened bank accounts in the company name, including a checking account with an associated debit card. He was the only signatory listed on these accounts.

Stewart never ran any legitimate business under the Eleete name. He had no legitimate source of income,[12] and the government was able to demonstrate at trial that most of the money that flowed through the Eleete accounts came from the sale of illegal drugs. Stewart purchased the Volkswagen he was driving at the time of his arrest with a check from the Eleete account. On the memo line, he noted that the check was for a "company car," and the car was in fact registered to the company. He also used the Eleete account debit card to make purchases at retail establishments. For example, the government introduced evidence that Stewart spent approximately $7400 at Saks Fifth Avenue, including a single purchase of $1200, all using the Eleete Image debit card rather than large amounts of cash that might have raised suspicion.

Money entered and left the Eleete accounts in unusual ways. For example, Stewart gave $10,000 in cash to a friend, purportedly to enable the friend to buy a car on Stewart's behalf. The friend never purchased a car, however, and instead

---

[12] Testimony at trial showed that, in the five years preceding his arrest, Stewart had gambling winnings of $1400, and that he sold a few paintings for less than $1000 total. That was the extent of any identifiable legitimate income during that time period.

returned the money to Stewart by writing three checks to Eleete Image, including at least one check from the friend's business account. Stewart also deposited into the Eleete accounts third party checks totaling more than $66,000 in a three-year period. These checks, made out to others and endorsed over to Stewart, outwardly appeared to be paychecks.

At trial, the government argued that Eleete Image was a "front company," "a scam and a sham." R. 202, at 645–46. The government contended that Stewart created Eleete Image and tried to make it look like a legitimate company in order to have a place to deal with the cash he earned from drug sales. Possessing and using large amounts of cash, the government argued, would potentially draw scrutiny, but using a business account and a business debit card helped prevent suspicion that the funds were illegitimate. When seeking a bank loan in 2014, for example, Stewart noted on the application that he had been "employed" by Eleete Image for five years and had an income of $6700 per month.

In closing arguments, the government went through the elements of money laundering one by one, associating evidence from the trial with proof of those elements. For the fourth element of money laundering, whether the defendant "knew that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of ongoing drug trafficking activity," the government argued in closing that the Eleete business account was designed to hide the nature of the funds as drug money and to distance Stewart from ownership of the funds:

Why does making cash deposits into the Eleete Image bank account—why does it meet that last element? Well, as we've discussed, what is the whole point of this Eleete Image bank account? The whole point is not to conduct any legitimate business. He had more than two years to do that or to make something of a start of it.

The point was he is a drug trafficker. That is what he does for a living. That is what he's done for a living for years, and he needs to find a way to spend and use his money in a way that's not going to raise eyebrows.

So, concealing or disguising the nature or source of that cash, well, once the cash—we do that financial transaction, put that somewhat small amount, couple thousand dollars—once we put that—run it through into the business account, now we're not just walking around with several thousand dollars in our pockets. It's a business account. It looks like business-related money. It can be spent like business-related money through the Eleete Image cards.

Then, of course, it also goes to the ownership or control, the attempt to hide the ownership or control. It's not Daniel Stewart walking around. It is Eleete Image who now has the money.

We know it is difficult—certainly the detectives did it; but it is somewhat difficult to make that leap from Eleete Image at Dowitch Lane, which we know is

associated with Rosemarie Brown, to Daniel Stewart
at 4523 Eagle Creek Parkway; but that was the point.

R. 202, at 656–57.

Stewart now claims that this evidence was insufficient as a
matter of law to prove money laundering. Citing *Esterman*,
Stewart contends that the government was required to prove
that the charged transactions were specifically designed to hide
the provenance of the funds involved. The government failed
to do so here, he argues, because he did nothing more than
deposit money into accounts that he opened, accounts that
could be traced easily back to him. He asserts that the facts of
his case are remarkably similar to the facts in *Esterman*, where
this court reversed a conviction for money laundering on the
same forfeited insufficiency-of-the-evidence claim that he raises
here. He notes that his name is on the incorporation papers for
Eleete, and that he is the signatory on the Eleete bank accounts.
Having made no attempt to hide behind the Eleete account, the
facts cannot support a finding of concealment under *Esterman*,
he argues. So we turn to *Esterman*.

In that case, Gary Esterman opened a bank account at
Edens Bank in Skokie, Illinois, with a Russian business partner
in order to facilitate the financing for a project that the two
were planning in Russia. The business partner returned to
Russia and money began flowing into the Edens Bank account.
Almost as quickly, Esterman began withdrawing money from
the account and transferring it to his G.E. International
Account at Michigan Avenue National Bank. Contrary to his
agreement with his Russian business partner, Esterman
engaged in at least thirty-three separate transactions including

wire transfers and withdrawals to remove the money from
Edens Bank, taking the money for his own personal use.
Esterman then spent the money in the G.E. account by with-
drawing cash or writing checks directly for purchases. 324 F.3d
at 567–68.

Assessing these facts, we noted that we have struggled "to
define precisely what amount of concealment must occur
before mere use of ill-gotten gains becomes money laundering
prohibited by subpart (B)(i) of the statute." 324 F.3d at 570.
Two principles emerged from the cases:

> First, we have tried to maintain some separation
> between the initial transaction from which illegal
> proceeds were derived and further transactions
> designed to conceal the source of those proceeds. …
> Second, we have stressed that the mere transfer and
> spending of funds is not enough to sweep conduct
> within the money laundering statute; instead,
> subsequent transactions must be specifically de-
> signed to hide the provenance of the funds involved.

*Esterman*, 324 F.3d at 570 (internal citations and quotation
marks omitted). To restate the first principle, "money launder-
ing criminalizes a transaction in proceeds, not the transaction
that creates the proceeds." *United States v. Mankarious*, 151 F.3d
694, 705 (7th Cir. 1998). The government's proof in *Esterman*
failed because the defendant made no effort to disguise or
conceal either his withdrawals from Edens Bank or the
destination of the funds. He simply made deposits into other
bank accounts that were correctly identified as his and then
spent the money in retail transactions.

We rejected the government's argument that, because the Russian business partner was unaware of the existence of the G.E. account, Esterman's use of that account established an intent to conceal:

> But this is just another way of describing Esterman's initial fraudulent scheme, whereby he took the money away from [the Russian business partner]. Most fraud victims probably assume that their money has either been spent or placed in an account of some sort, even if they do not know the specific destination of the funds. If that were enough to show money laundering at the same time, there would be no distinction left between money laundering and the underlying fraud, and individuals who perpetrate simple fraud by transferring ill-gotten funds into a personal account would always be triable as money launderers.

*Esterman*, 324 F.3d at 571–72.

The proceeds at issue in *Esterman* were generated by fraud. That is, fraud was the "specified unlawful activity" mentioned in section 1956(a)(1)(B)(i). In addition to the initial transaction where Esterman took the money by fraud, the government failed to prove that he engaged in an additional transaction that was designed "to hide the provenance of the funds involved." Instead, he simply deposited the money that he took by fraud into an easily identifiable account and began to spend it.

In Stewart's case, the proceeds were created by the specified unlawful activity of drug trafficking. In transactions that

are readily identifiable as separate from the original crime, Stewart took the cash generated from that drug trafficking and engaged in a series of steps designed to conceal or disguise that money as business proceeds rather than drug money. With those same steps, he sought to distance himself from personal ownership of the funds. He incorporated a business using a false address and then took several steps to make the business appear legitimate. He obtained an Employer Identification Number from the IRS and created a website. He opened a bank account in the name of the business and enlisted others to help him deposit drug proceeds into the account in a manner that would cause outsiders to believe the money was income to the business. On the two charged occasions, he simply deposited relatively small amounts of cash into the business account at ATMs. He then spent that money, sometimes on items that could probably be identified as strictly personal and sometimes on items, like his car, that he titled in the name of his sham business.

In short, this was not an *Esterman*-style scheme, where the defendant did little more than take money, store it and spend it. *Esterman* required "concrete evidence of intent to disguise or conceal transactions, whether that evidence comes directly from statements by the defendant that indicate an intent to conceal, or from circumstantial evidence like unusual secrecy surrounding transactions, careful structuring of transactions to avoid attention, folding or otherwise depositing illegal profits into the bank account or receipts of a legitimate business, use of third parties to conceal the real owner, or engaging in unusual financial moves culminating in a transaction." 324 F.3d at 573. Stewart's machinations surrounding the Eleete bank

account supply the necessary circumstantial evidence. Under the usual standard for a sufficiency of the evidence claim, we can easily conclude that a rational jury could have found the essential element of concealment (the only element challenged) beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. *Webster*, 775 F.3d at 904–05; *Aslan*, 644 F.3d at 540. Under the even more stringent standard of plain error, this is not a close case, and the money laundering convictions must be affirmed.

## III.

Finally, we note that Stewart raised a number of challenges to the admission of evidence that he characterizes as prejudicial and irrelevant "bad acts" evidence. Stewart asks us to review the admission of most of that evidence for plain error and some of it for abuse of discretion, depending on whether he preserved the particular objection in the district court. The government asserts both that the evidence was properly admitted and that, in any event, if there was error, it was harmless. We agree that any error in admitting the challenged evidence was harmless. "The test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Curtis*, 781 F.3d 904, 911 (7th Cir. 2015). The evidence against Stewart was overwhelming. *United States v. Gonzalez*, 863 F.3d 576, 588–89 (7th Cir. 2017) (evidentiary error found harmless where there was overwhelming admissible evidence of guilt). The admissible evidence included kilogram quantities of drugs, five firearms, and nearly half a million dollars in cash. The prosecution's case

36                                                            No. 16-4105

would have been no less persuasive had the challenged evidence been excluded.

AFFIRMED

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604



CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

October 26, 2018

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

J. PHIL GILBERT, *District Judge*\*

No. 16-4105

| | |
|---|---|
| UNITED STATES OF AMERICA<br>    *Plaintiff-Appellee*, | Appeal from the United States District Court for the Southern District of Indiana, Indianapolis Division. |
| *v.* | |
| DANIEL STEWART,<br>    *Defendant-Appellant*. | No. 1:15-cr-00024-WTL-DKL-1<br><br>William T. Lawrence, *Judge*. |

## O R D E R

No judge of the court having called for a vote on the Petition for Rehearing En Banc, filed by Defendant-Appellant on October 10, 2018, and all of the judges on the original panel having voted to deny the same,

IT IS HEREBY ORDERED that the Petition for Rehearing En Banc is DENIED.

---

\* Of the Southern District of Illinois, sitting by designation.